**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **BRENDAN WARD MASONRY, INC.** : | |
| : | |
| **Plaintiff** : | |
| : | |
| : | **BREACH OF CONTRACT** |
| : | |
| **v.** : | |
| : | |
| **WU & ASSOCIATES, INC.** : | **JURY TRAIL DEMANDED** |
| : | |
| **Defendant** : | **CIVIL NO. 07-cv-00751 GMS** |
| : | |

**MOTION OF PLAINTIFF, BRENDAN WARD MASONRY, INC., FOR
LEAVE TO FILE PLAINTIFF'S SECOND AMENDED COMPLAINT**

Plaintiff, Brendan Ward Masonry, Inc., by and through its attorneys, DeVlieger Hilser

P.C., brings this Motion for Leave to File its Second Amended Complaint against Defendant,

WU & Associates, Inc., pursuant to Fed. R. Civ. P. 15 et seq. and avers as follows:

**PARTIES**

1.      Plaintiff, Brendan Ward Masonry, Inc. (hereinafter "Ward"), filed its First

Amended Complaint against Defendant, Wu & Associates, Inc. (hereinafter "Wu"), on or about

December 13, 2007.

2.      In response thereto, Defendant, Wu,  filed its First Answer to Plaintiff's Amended

Complaint and Counterclaim on January 28, 2008.

3.      On March 13, 2008, Defendant, Wu, filed its Motion for Leave to File an

Amended Answer to Plaintiff's Amended Complaint.

4.      Defendant, Wu, in neither its First Answer to Plaintiff's Amended Complaint with Counterclaim nor its Proposed Amended Answer to Plaintiff's Amended Complaint, attached to its Motion for Leave to File, has sought to strike or dismiss Plaintiff's Amended Complaint.

5.      Plaintiff, Ward, seeks to Amend its First Amended Complaint to add a Count of Destruction of Business, with supporting facts and exhibits, against Defendant, Wu. A true and correct copy of Plaintiff's Proposed Second Amended Complaint with the additions underlined is attached hereto and incorporated herein as Exhibit "1."

6.      Defendant, Wu, was noticed of Ward's intention to move to amend its Second Amended Complaint with the aforementioned Count and the Court was informed in the Joint Status Report filed on April 11, 2008.

7.      On May 1, 2008, pursuant to the Proposed Order filed by Wu and Ward, this Honorable Court Ordered the Motions for Amended Pleadings be filed by June 2, 2008.

8.       Pursuant to the Court's Order, Plaintiff, Ward, hereby brings this Motion for leave to file Plaintiff's Proposed Second Amended Complaint in the form attached hereto. See Plaintiff's Proposed Second Amended Complaint (without additions underlined), a true and correct copy of which is attached hereto and incorporated herein as Exhibit "2."

9.      Federal Rule of civil Procedure 15(a) sets forth that after the initial pleadings have been responded to:

> a party may amend the party's pleading only by leave of court or by written consent of the adverse party ; and leave shall be freely given when justice so requires.

Fed. R. Civ. P. 15(a); Foman v. Davis, 371 U.S. 178, 182 83. S.Ct. 227, 9 L.Ed.2d. 222 (1962).

10.      It is within the discretion of the court to determine the appropriateness of the proposed amendment and to deny the amendment when considering the factors of undue delay,

bad faith on the part of the party seeking the amendment, undue prejudice to the opposing party or futility of the amendment.; Arthur v. Maersk, Inc., 434 F.3d 196, 203 (3d Cir. 2006); see also, Adams v. Gould, Inc., 739 F.2d 858, 868 (3d Cir. 1984); Massarsky v. General Motors Corp., 706 F.2d 111 (3d Cir. 1983).

11.     In the absence of an inordinate delay, a motion for leave to amend should be granted as long as there is no undue prejudice to the non-moving party. Arthur, 434 F.3d at 204 (wherein the Third Circuit noted that "only one appellate court . . . has approved . . . denial of leave to amend based on a delay of less than one year").

12.     In the present case, there has been no inordinate delay and Defendant, Wu, is not unduly prejudiced as it had prior notice of the proposed amendment, discovery has yet to commence and the proposed additional count to Plaintiff's Complaint arises out of the same facts and circumstances as Plaintiff's original pleading.

**WHEREFORE**, Plaintiff, Brendan Ward Masonry, Inc., respectfully requests that its Motion to Amend its Complaint to add a Count of Destruction of Business, with supporting facts and exhibits, be granted and be Plaintiff allowed to file its Second Amended Complaint in the form attached hereto as Exhibit 2.

ABER, GOLDLUST, BAKER & OVER

/s/ Perry F. Goldlust
PERRY F. GOLDLUST (DSB #770)
702 King Street, Ste. 600
P.O. Box 1675
Wilmington, DE 19899-1675
(302) 472-4900; (302) 472-4920 (FAX)
pgoldlust@gablawde.com
*Attorney for Plaintiff Brendan Ward Masonry, Inc.*

DATED:  May 21, 2008

**Of Counsel:**
JOHN E. HILSER, ESQUIRE
DEVLIEGER HILSER, P.C.
1518 Walnut Street, 16th Floor
Philadelphia, PA 19102
(215) 735-9181; (215) 735-9186 (FAX)
jhilser@dvhlaw.com

F:\Brendan Ward.110\Willimington Job.001\plds\USDC Delaware\motion for leave to file amended complaint.wpd

**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **BRENDAN WARD MASONRY, INC.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| | : | **BREACH OF CONTRACT** |
| **v.** | : | |
| | : | |
| **WU & ASSOCIATES, INC.,** | : | **JURY TRAIL DEMANDED** |
| | : | |
| **Defendant.** | : | **CIVIL NO. 07-cv-00751** |
| | : | |

**NOTICE OF MOTION**

TO:     Peter L. Frattarelli, Esquire
        Archer & Freiner, P.C.
        300 Delaware Avenue
        Suite 1370
        Wilmington, DE  19801


        PLEASE TAKE NOTICE that the attached Motion of Plaintiff, Brendan Ward Masonry,

Inc., for Leave to File its Second Amended Complaint will be presented to this Honorable Court

at the Court's convenience.

                        ABER, GOLDLUST, BAKER & OVER


                        /s/ Perry F. Goldlust (DSB #770)
                        PERRY F. GOLDLUST (DSB #770)
                        702 King Street, Suite 600
                        P. O. Box 1675
                        Wilmington, DE  19899-1675
                        (302) 472-4900; (302) 472-4920 (FAX)
                        pgoldlust@gablawde.com
                        *Attorney for Plaintiff Brendan Ward Masonry, Inc*

DATED: May 21, 2008

Of Counsel:
JOHN E. HILSER, ESQUIRE
DEVLIEGER HILSER, P.C.
1518 Walnut Street, 16th Floor
Philadelphia, PA 19102
(215) 735-9181; (215) 735-9186 (FAX)
jhilser@dvhlaw.com

Client/Hilser/Notice of Motion to Dismiss

# EXHIBIT "1"

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BRENDAN WARD MASONRY, INC. | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| | : | **BREACH OF CONTRACT** |
| | : | |
| v. | : | |
| | : | |
| WU & ASSOCIATES, INC. | : | **JURY TRAIL DEMANDED** |
| | : | |
| Defendant | : | **CIVIL NO. 07-cv-00751 GMS** |
| | : | |

## SECOND AMENDED COMPLAINT

Plaintiff, Brendan Ward Masonry, Inc., by and through its attorneys, DeVlieger Hilser

P.C., brings this Second Amended Complaint against Defendant, Wu & Associates, Inc.,

pursuant to Fed. R. Civ. P. 15 (a)(2) and avers as follows:

### PARTIES

1.      Plaintiff, Brendan Ward Masonry, Inc. (hereinafter "Ward") is a corporation

organized and existing under the laws of the Commonwealth of Pennsylvania, was formerly

licensed as a contractor/subcontractor with the City of Wilmington, Delaware, with its principal

place of business at 345 Oak Terrace, Radnor, PA 19087.

2.      Defendant, Wu & Associates, Inc. (hereinafter "Wu") is a corporation organized

under the laws of the State of New Jersey with its principal place of business at 597 Deer Road,

Cherry Hill, New Jersey 08034.

### JURISDICTION

3.      Jurisdiction exists in this case because there is complete diversity of citizenship

between the parties as required by 28 U.S.C. § 1332 and the amount in controversy, exclusive of

costs and interests, exceeds $150,000.00.

## VENUE

4.      Venue is proper in the District of Delaware pursuant to 28 U.S.C. § 1391 because

a substantial part of the events, acts or omissions giving rise to the claim occurred in this District.

Furthermore, a substantial part of the property that is the subject of the contract for the project

involved in this action is located in this District.

## BACKGROUND AND GENERAL ALLEGATIONS

5.      On or about August 2001, Wu entered into a written contract with the Department

of Labor for the United States of America as the general contractor for work to be performed for

a federal construction project, number 0102, at the Wilmington Job Corps Center, 9 Vandever

Avenue, Wilmington, Delaware 19802.

6.      On or about April 5 2002, Ward entered into a Subcontractor Agreement

with Wu to furnish labor, equipment, materials and perform masonry work for the

aforementioned federal project. A true and correct copy of which is attached hereto and

incorporated herein as Exhibit "A."

7.      The Subcontractor Agreement provided for a guaranteed maxim contract price of

$950,000.00 and further provided that this price would be increased in the event that certain

conditions or modifications were instituted pursuant to Change Orders. See Exhibit A.

8.      Ward substantially performed all of its obligation under the Subcontractor

Agreement.

9.      Wu has failed to perform its obligations under the Subcontractor Agreement.

10.     Wu has failed to fully pay Ward pursuant to the Subcontractor Agreement.

11.     Wu's failure to perform its obligations under the Subcontractor Agreement has caused Ward to suffer damages in excess of $1,206,000.69.

12.     On December 16, 2004, for the substantial consideration of agreeing to withdraw and dismiss its claims against both Ward and the Surety, Ward entered into a Tolling Agreement with Wu suspending any and all "statutes of limitations, laches periods, or similar defenses" pursuant to the scheduling of a future arbitration. See Exhibit "B," a true and correct copy of which is attached hereto and incorporated herein.

13.     Wu refused to arbitrate Ward's claims pursuant to the Tolling Agreement, forcing Ward to file this litigation.

14.     Wu's failure to arbitrate Ward's claims under the Tolling Agreement has caused Ward to suffer the aforementioned damages in addition to increased costs and attorney's fees.

15.     Wu's failure to perform its obligations under the Subcontractor Agreement and its failure to arbitrate Ward's claims has caused the irreparable destruction of Ward's business.

## COUNT I
### (Breach of the Contractual Obligation)

16.     Plaintiff, Ward, hereby incorporates paragraphs 1 through 15 as though same were fully set forth at length herein.

17.     The original Subcontractor Agreement between Wu and Ward for the aforementioned federal project provided for a maximum contract price of $950,000.00.

18.     This amount was to be supplemented and modified by various "Change Orders."

19.     The original Subcontractor Agreement was increased an additional $3,861.84 through approved Change Orders. A true and correct chronological compilation of the Approved

Additions to the original agreement is attached hereto and incorporated herein as Exhibit C.

20.    Ward substantially performed its obligation under the Subcontractor Agreement.

21.    Wu has only paid Wu $846,063.67 on the original Subcontractor Agreement and the aforementioned Approved Change Orders.

22.    Wu owes Ward in excess of $107.798.16 on the original Subcontractor Agreement and approved Change Orders.

23.    Wu has <u>repeatedly</u> failed and refused to perform its duties under the Subcontractor Agreement causing Ward to suffer substantial losses.

24.    As the direct result and proximate result of the Wu's failure to perform its duties under the Subcontractor Agreement, Ward suffered extended overhead, loss of production, lost profits, additional production costs, additional operating costs, substantial wage increases and substantial cash shortages in excess of $434,962.25.

**WHEREFORE**, Brendan Ward Masonry, Inc. demands judgment in its favor and against Defendant, Wu & Associates, Inc., in excess of $1,206,000.69 together with interest and costs, attorney's fees, delay damages, consequential damages and punitive damages where appropriate.

<u>**COUNT II**</u>
<u>**(Breach of the Contractual Obligation- Cardinal Change Doctrine)**</u>

25.    Plaintiff, Ward, hereby incorporates paragraphs 1 through <u>24</u> as though same were fully set forth at length herein.

26.    The original Subcontractor Agreement between Wu and Ward for the aforementioned federal project provided for a maximum contract price of $950,000.00.

27.    This amount was to be supplemented and modified by various "Change Orders."

28.    The agreed upon increases to the original Subcontractor Agreement totaled $3,861.84 increasing the maximum contract price to $953,861.84. See Exhibit C.

29.    Wu breached the Subcontractor Agreement by effectuating monumental changes in the required work that forced Ward to perform duties substantially different in scope than the originally contemplated Subcontractor Agreement. These changes included, but are not limited to:

    a.    Wu's substantial and indefinite delays which caused Ward to "stand by," effectively preventing him from obtaining other work;

    b.    Wu's inefficiency in scheduling which caused substantial and indefinite delays that directly effected Ward's ability to work on the project;

    c.    Wu's inefficiency in its construction methods and procedures which caused substantial and indefinite delays that directly effected Ward's ability to work on the project;

    d.    Wu's inability to coordinate other workers whose performance was a prerequisite to Ward's own performance which caused substantial and indefinite delays that directly effected Ward's ability to work on the project.

    e.    Wu's inability to pay Ward on a timely basis pursuant to the Subcontractor Agreement which caused Ward to borrow substantial funds in order fulfill his obligations to its workers and suppliers.

30.    The aforementioned changes were completely within the manipulation of Wu and were so significant that they were not covered under the Change Order clause of the Subcontractor Agreement causing Ward to suffer substantial losses.

31.    As the direct result and proximate result of the above, Ward suffered extended overhead, loss of production, lost profits, additional production costs, additional operating costs, substantial wage increases and substantial cash shortages in excess of $434,962.25.

WHEREFORE, Brendan Ward Masonry, Inc. demands judgment in its favor and against

Defendant, Wu & Associates, Inc., in excess of $1,206,000.69 together with interest and costs,

attorney's fees, delay damages, consequential damages and punitive damages where appropriate.

**COUNT III**
**(Breach of the Contractual Obligation- Tolling Subcontractor Agreement**

32.    Plaintiff, Ward, hereby incorporates paragraphs 1 through 31 as though same

were fully set forth at length herein.

32.    In reliance on the Tolling Agreement, Ward withdrew and dismissed

its claims against Wu's Surety pending in the United States Federal Court for the District of

Delaware.

33.    Pursuant to the Tolling Agreement, Wu agreed to the suspension of all "statutes

of limitations, laches periods, or similar defenses" and agreed to arbitrate Ward's claims at a

later date. See Exhibit B.

34.    Wu has refused to arbitrate Ward's claims pursuant to the Tolling Agreement.

35.    Wu's refusal to abide by the Tolling Agreement has caused Ward to suffer

damages in excess of $1,206,000.69 in addition to increased costs and attorney's fees.

36.    The Subcontractor Agreement between Wu and Ward for the aforementioned

federal project provided for disputes to be litigated under New Jersey Law. See Exhibit A, ¶ 29.

37.    Pursuant to New Jersey Rules of Court 4:42-11, Ward is entitled to pre-judgment

interest on its damages arising out of the Subcontractor Agreement from the date of the initial

claim. Dial America Marketing, Inc. v. Keyspan Energy Corporation, 865 A.2d 778 (N.J. Super

2005).

38.    Wu's refusal to abide by the tolling agreement and arbitrate Ward's claims hereby

entitles Ward to pre-judgment interest from 2004 through the present.

39.     Wu owes over $65,234.34 in pre-judgment interest on Ward's claims arising out of the Subcontractor Agreement.

**WHEREFORE**, Brendan Ward Masonry, Inc. demands judgment in its favor and against Defendant, Wu & Associates, Inc., in excess of $1,206,000.69 together with interest and costs, attorney's fees, delay damages, consequential damages and punitive damages where appropriate.

<u>**COUNT IV**</u>
<u>**(Bad Faith)**</u>

40.     Plaintiff, Ward, hereby incorporates paragraphs 1 through <u>39</u> as though same were fully set forth at length herein.

41.     As subcontractor to Wu on the aforementioned project, Ward was unjustly prevented from performing its obligations under the contract in an efficient and productive manner.

42.     After contracting with Ward for $950,000.00 in the Subcontractor Agreement, Wu, after the scheduled start date, unjustly and without explanation, submitted various change orders removing previously agreed to items from the Subcontractor Agreement, including, but not limited to, various stone piers and walls. A true and correct chronological compilation of the Unapproved Back Charges to the original agreement is attached hereto and incorporated herein as Exhibit D.

43.     The above back charges unjustly reduced the Subcontractor Agreement by $81,031.54. See Exhibit D.

44.     Wu's inexplicit changes were willful and malicious, done in bad faith for the purpose of punishing Ward and to create an unjust economic windfall for Wu.

45.     Pursuant to the Subcontractor Agreement, Ward was also supposed to start on the project in June 2002.

46.     Wu knew or should have known that he would not be ready for Ward to begin work on the project in June 2002.

47.     Wu willfully, intentionally, maliciously and in bad faith, misled Ward in order to avoid the added cost of finding another subcontractor for the later start date.

48.     Additionally, Wu repeatedly thwarted Ward from performing his duties under the Subcontractor Agreement.

49.     Wu repeatedly throughout the course of the project, also, refused to provide proper drawings and clarifications so Ward could complete its obligation under the Subcontractor Agreement.

50.     Wu repeatedly throughout the course of the project, also, failed to provide adequate water supply, essential for Ward to perform its obligations under the Subcontractor Agreement.

51.     Wu, also, repeatedly prevented Ward from starting and completing various duties under the Subcontractor Agreement because other work within the dominion and control of Wu was incomplete, unfinished and/or improperly scheduled by Wu.

52.     Wu, also, repeatedly refused to attend meetings with Ward and various masonry material providers concerning masonry issues and concerns.

53.     As a direct and proximate result of the aforementioned delays and mismanagement, Ward has also suffered over $202,998.55 in delay damages, increased costs and lost revenue.

54.     The above foregoing conduct by Wu was willful, malicious, done in bad faith and

designed to coerce Ward to surrender his legal rights, with the intent to wrongfully terminate Ward from the project.

WHEREFORE, Brendan Ward Masonry, Inc. demands judgment in its favor and against Defendant, Wu & Associates, Inc., in excess of $1,206,000.69 together with interest and costs, attorney's fees, delay damages, consequential damages and punitive damages where appropriate.

### COUNT V
### (Unjust Enrichment)

55.    Plaintiff, Ward, hereby incorporates paragraphs 1 through 54 as though same were fully set forth at length herein.

56.    Wu, unjustly back charged the aforementioned stone walls and piers and then hired outside laborers at a reduced rate to finish the stone walls and piers in direct contravention of the Subcontractor Agreement.

57.    As a direct and proximate result of the above action, Wu realized a windfall profit of over $11,630.00 which unjustly enriched Wu to Ward's detriment.

58.    As subcontractor to Wu on the aforementioned project, Ward also suffered considerable losses as a result of Wu's substantial and indefinite delays and Wu's inability to perform its obligations under the Subcontractor Agreement.

59.    As general contractor to the written contract with the Department of Labor for the United States of America on the aforementioned Wilmington Job Corp Center project, has received substantial amounts of money from the United States Government pursuant to the contract and various claims against said contract.

60.    Upon information and belief, Ward as subcontractor to Wu on the project, is not

entitled to pursue administrative claims before the United States Court of Claims.

61.    Any and all compensation received by Wu as a result of any final payments or claims adjudicated pursuant to the contract, which are directly or indirectly related to the services performed by Ward pursuant to the Subcontractor Agreement between Wu and Ward, has unjustly enriched Wu to Ward's detriment.

**WHEREFORE**, Brendan Ward Masonry, Inc. demands judgment in its favor and against Defendant, Wu & Associates, Inc., in excess of $1,206,000.69 together with interest and costs, attorney's fees, delay damages, consequential damages and punitive damages where appropriate.

<u>**COUNT VI**</u>
<u>**(Quantum Meruit)**</u>

62.    Plaintiff, Ward, hereby incorporates paragraphs 1 through 61 as though same were fully set forth at length herein.

63.    The original Subcontractor Agreement between Wu and Ward for the aforementioned federal project provided for a maximum contract price of $950,000.00.

64.    This amount was to be supplemented and modified by various "Change Orders."

65.    Ward performed various services at the request of Wu for the aforementioned federal project which were above and beyond the scope of those services specifically enumerated in the Subcontractor Agreement.

66.    Ward performed these services with the explicit understanding that Wu would pay for said services by way of various Change Orders.

67.    At Wu's request, pursuant to the aforementioned understanding, Ward submitted $42,934.00 in Change Orders and Additions. A true and correct chronological compilation of the

Unapproved Change Orders/Additions to the original agreement is attached hereto and incorporated herein as Exhibit E.

68.     Wu has refused to <u>approve and</u> pay for these additional services causing Ward to sustain <u>additional</u> damages in excess of $42,934.00.

**WHEREFORE**, Brendan Ward Masonry, Inc. demands judgment in its favor and against Defendant, Wu & Associates, Inc., in excess of $1,206,000.69 together with interest and costs, attorney's fees, delay damages, consequential damages and punitive damages where appropriate.

### COUNT VII
### (Destruction of Business)

69.     Plaintiff, Ward, hereby incorporates paragraphs 1 through 68 as though same were fully set forth at length herein.

70.     The original Subcontractor Agreement between Wu and Ward for the aforementioned federal project ["Project"] provided for a maximum contract price of $950,000.00.

71.     In addition to the original $950,000.00 contracted price, Wu also approved $3,861.84 in Change Orders during the course of the Project. See Exhibit C.

72.     Ward substantially performed its obligations under the Subcontractor Agreement.

73.     Wu has only paid Ward $846,063.67 on the original Subcontractor Agreement and aforementioned Approved Change Orders and has also failed and refused to perform its other duties under the Subcontractor Agreement, causing Ward to suffer substantial losses and financial hardship.

74.     After Ward started performing on the contract, Wu unjustly and without explanation, submitted various back charges and/or change orders removing previously agreed to

items from the Subcontractor Agreement, including, but not limited to, various stone piers and walls.

75.    These changes unjustly reduced the Subcontractor Agreement by $81,031.54. See Exhibit D.

76.    Wu's unjustified reductions to the Subcontractor's Agreement caused Ward to suffer a significant loss of profit and severe financial distress.

77.    Ward also performed various services at the request of Wu for the Project which were above and beyond the scope of those services specifically enumerated in the Subcontractor Agreement.

78.    Ward performed these services with the explicit understanding that Wu would pay for said services by way of various change orders and additions.

79.    At Wu's request, pursuant to the aforementioned understanding, Ward submitted $42,934.00 in change orders and additions for payment for these services. See Exhibit E.

80.    Wu refused to approve Ward's change orders and additions for payment.

81.    Wu's unjustified refusal to approve the change orders and additions for payment has caused Ward to suffer a significant loss of profit and severe financial distress.

82.    Pursuant to the Subcontractor Agreement, Ward was supposed to start on the project in June 2002.

83.    Ward justifiedly relied upon the June 2002 starting date in scheduling work for its other customers.

84.    Wu knew or should have known that he would not be ready for Ward to begin work on the project in June 2002.

85.    Wu's unjustifiable delays, prevented Ward from beginning work on the Project

and forced Ward to cancel and/or not schedule other profitable work during the significant delay period.

86.     Wu's willful and or intentional deficiencies in managing the Project, directly effected Ward's ability to work on the project causing Ward to allocate an inordinate amount of time, workers, equipment  and resources which normally would have been allocated to Ward's other customers.

87.     Wu's actions have caused Ward to suffer over $202,998.55 in additional financial hardships including, but not limited to:

        a.     Extended overhead;

        b.     Additional production costs;

        c.     Additional forklift operator costs;

        d.     Additional forklift and mixer rentals;

        e.     Additional scaffolding equipment costs;

        f.     Additional trailer rental costs;

        g.     Mandatory Union Wage Increase; and

        h.     the penalties and associated costs of cash flow shortages.

88.     In reliance on the aforementioned Tolling Agreement, Ward also withdrew and dismissed its claims against Wu's Surety pending in the United States Federal Court for the District of Delaware in anticipation of arbitrating its claims in a timely manor.

89.     Wu's refusal to abide by the tolling agreement and arbitrate Ward's claims has caused Ward to suffer severe financial hardships including but not limited to the loss of monies owed under the claim, the loss of over $65,234.34 in pre-judgment interest due on the claim pursuant to N.J.R. 4:42-11 and increased costs and attorneys' fees.

90.    As the direct result and proximate result of the above actions, Ward has suffered

irreparable damage to its business including, but not limited to, loss of production, lost profits,

substantial cash shortages and a loss of reputation in the business community.

91.    Prior to the above actions, Brendan Ward Masonry, Inc. was valued in excess of

$500,000.00.

92.    As a direct and proximate result of the above actions, Ward has suffered the

irreparable destruction and total devaluation of its business.

**WHEREFORE**, Plaintiff, Brendan Ward Masonry, Inc., hereby demands judgment in its

favor and against Defendant, Wu & Associates, Inc., in excess of $1,206,000.69 together with

interest and costs, attorney's fees, delay damages, consequential damages and punitive damages

where appropriate.

**ABER, GOLDLUST, BAKER & OVER**

_____

**PERRY F. GOLDLUST, ESQUIRE (DSB #770)**
702 King Street, Ste. 600
P.O. Box 1675
Wilmington, DE 19899-1675
(302) 472-4900; (302) 472-4920 (FAX)
pgoldlust@gablawde.com
*Attorney for Plaintiff Brendan Ward Masonry, Inc.*

**DATED:**

**Of Counsel:**
JOHN E. HILSER, ESQUIRE
DEVLIEGER HILSER, P.C.
1518 Walnut Street, 16th Floor
Philadelphia, PA 19102
(215) 735-9181; (215) 735-9186 (FAX)
jhilser@dvhlaw.com

F:\Brendan Ward.110\Willimington Job.001\plds\USDC Delaware\Second Amended Complaint.wpd

# EXHIBIT "2"

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **BRENDAN WARD MASONRY, INC.** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| | : | **BREACH OF CONTRACT** |
| | : | |
| **v.** | : | |
| | : | |
| **WU & ASSOCIATES, INC.** | : | **JURY TRAIL DEMANDED** |
| | : | |
| **Defendant** | : | **CIVIL NO. 07-cv-00751 GMS** |
| | : | |

## SECOND AMENDED COMPLAINT

Plaintiff, Brendan Ward Masonry, Inc., by and through its attorneys, DeVlieger Hilser P.C., brings this Second Amended Complaint against Defendant, Wu & Associates, Inc., pursuant to Fed. R. Civ. P. 15 (a)(2) and avers as follows:

## PARTIES

1.    Plaintiff, Brendan Ward Masonry, Inc. (hereinafter "Ward") is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, was formerly licensed as a contractor/subcontractor with the City of Wilmington, Delaware, with its principal place of business at 345 Oak Terrace, Radnor, PA 19087.

2.    Defendant, Wu & Associates, Inc. (hereinafter "Wu") is a corporation organized under the laws of the State of New Jersey with its principal place of business at 597 Deer Road, Cherry Hill, New Jersey 08034.

## JURISDICTION

3.    Jurisdiction exists in this case because there is complete diversity of citizenship

between the parties as required by 28 U.S.C. § 1332 and the amount in controversy, exclusive of costs and interests, exceeds $150,000.00.

## VENUE

4.      Venue is proper in the District of Delaware pursuant to 28 U.S.C. § 1391 because a substantial part of the events, acts or omissions giving rise to the claim occurred in this District. Furthermore, a substantial part of the property that is the subject of the contract for the project involved in this action is located in this District.

## BACKGROUND AND GENERAL ALLEGATIONS

5.      On or about August 2001, Wu entered into a written contract with the Department of Labor for the United States of America as the general contractor for work to be performed for a federal construction project, number 0102, at the Wilmington Job Corps Center, 9 Vandever Avenue, Wilmington, Delaware 19802.

6.      On or about April 5 2002, Ward entered into a Subcontractor Agreement with Wu to furnish labor, equipment, materials and perform masonry work for the aforementioned federal project. A true and correct copy of which is attached hereto and incorporated herein as Exhibit "A."

7.      The Subcontractor Agreement provided for a guaranteed maxim contract price of $950,000.00 and further provided that this price would be increased in the event that certain conditions or modifications were instituted pursuant to Change Orders. See Exhibit A.

8.      Ward substantially performed all of its obligation under the Subcontractor Agreement.

9.      Wu has failed to perform its obligations under the Subcontractor Agreement.

10.      Wu has failed to fully pay Ward pursuant to the Subcontractor Agreement.

11.     Wu's failure to perform its obligations under the Subcontractor Agreement has caused Ward to suffer damages in excess of $1,206,000.69.

12.     On December 16, 2004, for the substantial consideration of agreeing to withdraw and dismiss its claims against both Ward and the Surety, Ward entered into a Tolling Agreement with Wu suspending any and all "statutes of limitations, laches periods, or similar defenses" pursuant to the scheduling of a future arbitration. See Exhibit "B," a true and correct copy of which is attached hereto and incorporated herein.

13.     Wu refused to arbitrate Ward's claims pursuant to the Tolling Agreement, forcing Ward to file this litigation.

14.     Wu's failure to arbitrate Ward's claims under the Tolling Agreement has caused Ward to suffer the aforementioned damages in addition to increased costs and attorney's fees.

15.     Wu's failure to perform its obligations under the Subcontractor Agreement and its failure to arbitrate Ward's claims has caused the irreparable destruction of Ward's business.

## COUNT I
## (Breach of the Contractual Obligation)

16.     Plaintiff, Ward, hereby incorporates paragraphs 1 through 15 as though same were fully set forth at length herein.

17.     The original Subcontractor Agreement between Wu and Ward for the aforementioned federal project provided for a maximum contract price of $950,000.00.

18.     This amount was to be supplemented and modified by various "Change Orders."

19.     The original Subcontractor Agreement was increased an additional $3,861.84 through approved Change Orders. A true and correct chronological compilation of the Approved

Additions to the original agreement is attached hereto and incorporated herein as Exhibit C.

20.    Ward substantially performed its obligation under the Subcontractor Agreement.

21.    Wu has only paid Wu $846,063.67 on the original Subcontractor Agreement and the aforementioned Approved Change Orders.

22.    Wu owes Ward in excess of $107,798.16 on the original Subcontractor Agreement and approved Change Orders.

23.    Wu has repeatedly failed and refused to perform its duties under the Subcontractor Agreement causing Ward to suffer substantial losses.

24.    As the direct result and proximate result of the Wu's failure to perform its duties under the Subcontractor Agreement, Ward suffered extended overhead, loss of production, lost profits, additional production costs, additional operating costs, substantial wage increases and substantial cash shortages in excess of $434,962.25.

**WHEREFORE**, Brendan Ward Masonry, Inc. demands judgment in its favor and against Defendant, Wu & Associates, Inc., in excess of $1,206,000.69 together with interest and costs, attorney's fees, delay damages, consequential damages and punitive damages where appropriate.

## COUNT II
### (Breach of the Contractual Obligation- Cardinal Change Doctrine)

25.    Plaintiff, Ward, hereby incorporates paragraphs 1 through 24 as though same were fully set forth at length herein.

26.    The original Subcontractor Agreement between Wu and Ward for the aforementioned federal project provided for a maximum contract price of $950,000.00.

27.    This amount was to be supplemented and modified by various "Change Orders."

28.     The agreed upon increases to the original Subcontractor Agreement totaled $3,861.84 increasing the maximum contract price to $953,861.84. See Exhibit C.

29.     Wu breeched the Subcontractor Agreement by effectuating monumental changes in the required work that forced Ward to perform duties substantially different in scope than the originally contemplated Subcontractor Agreement. These changes included, but are not limited to:

      a.    Wu's substantial and indefinite delays which caused Ward to "stand by," effectively preventing him from obtaining other work;

      b.    Wu's inefficiency in scheduling which caused substantial and indefinite delays that directly effected Ward's ability to work on the project;

      c.    Wu's inefficiency in its construction methods and procedures which caused substantial and indefinite delays that directly effected Ward's ability to work on the project;

      d.    Wu's inability to coordinate other workers whose performance was a prerequisite to Ward's own performance which caused substantial and indefinite delays that directly effected Ward's ability to work on the project.

      e.    Wu's inability to pay Ward on a timely basis pursuant to the Subcontractor Agreement which caused Ward to borrow substantial funds in order fulfill his obligations to its workers and suppliers.

30.     The aforementioned changes were completely within the manipulation of Wu and were so significant that they were not covered under the Change Order clause of the Subcontractor Agreement causing Ward to suffer substantial losses.

31.     As the direct result and proximate result of the above, Ward suffered extended overhead, loss of production, lost profits, additional production costs, additional operating costs, substantial wage increases and substantial cash shortages in excess of $434,962.25.

**WHEREFORE**, Brendan Ward Masonry, Inc. demands judgment in its favor and against Defendant, Wu & Associates, Inc., in excess of $1,206,000.69 together with interest and costs, attorney's fees, delay damages, consequential damages and punitive damages where appropriate.

## COUNT III
### (Breach of the Contractual Obligation- Tolling Subcontractor Agreement

32.    Plaintiff, Ward, hereby incorporates paragraphs 1 through 31 as though same were fully set forth at length herein.

32.    In reliance on the Tolling Agreement, Ward withdrew and dismissed its claims against Wu's Surety pending in the United States Federal Court for the District of Delaware.

33.    Pursuant to the Tolling Agreement, Wu agreed to the suspension of all "statutes of limitations, laches periods, or similar defenses" and agreed to arbitrate Ward's claims at a later date. See Exhibit B.

34.    Wu has refused to arbitrate Ward's claims pursuant to the Tolling Agreement.

35.    Wu's refusal to abide by the Tolling Agreement has caused Ward to suffer damages in excess of $1,206,000.69 in addition to increased costs and attorney's fees.

36.    The Subcontractor Agreement between Wu and Ward for the aforementioned federal project provided for disputes to be litigated under New Jersey Law. See Exhibit A, ¶ 29.

37.    Pursuant to New Jersey Rules of Court 4:42-11, Ward is entitled to pre-judgment interest on its damages arising out of the Subcontractor Agreement from the date of the initial claim. Dial America Marketing, Inc. v. Keyspan Energy Corporation, 865 A.2d 778 (N.J. Super 2005).

38.    Wu's refusal to abide by the tolling agreement and arbitrate Ward's claims hereby

entitles Ward to pre-judgment interest from 2004 through the present.

39.    Wu owes over $65,234.34 in pre-judgment interest on Ward's claims arising out of the Subcontractor Agreement.

**WHEREFORE**, Brendan Ward Masonry, Inc. demands judgment in its favor and against Defendant, Wu & Associates, Inc., in excess of $1,206,000.69 together with interest and costs, attorney's fees, delay damages, consequential damages and punitive damages where appropriate.

### COUNT IV
### (Bad Faith)

40.    Plaintiff, Ward, hereby incorporates paragraphs 1 through 39 as though same were fully set forth at length herein.

41.    As subcontractor to Wu on the aforementioned project, Ward was unjustly prevented from performing its obligations under the contract in an efficient and productive manner.

42.    After contracting with Ward for $950,000.00 in the Subcontractor Agreement, Wu, after the scheduled start date, unjustly and without explanation, submitted various change orders removing previously agreed to items from the Subcontractor Agreement, including, but not limited to, various stone piers and walls. A true and correct chronological compilation of the Unapproved Back Charges to the original agreement is attached hereto and incorporated herein as Exhibit D.

43.    The above back charges unjustly reduced the Subcontractor Agreement by $81,031.54. See Exhibit D.

44.    Wu's inexplicit changes were willful and malicious, done in bad faith for the purpose of punishing Ward and to create an unjust economic windfall for Wu.

45.     Pursuant to the Subcontractor Agreement, Ward was also supposed to start on the project in June 2002.

46.     Wu knew or should have known that he would not be ready for Ward to begin work on the project in June 2002.

47.     Wu willfully, intentionally, maliciously and in bad faith, misled Ward in order to avoid the added cost of finding another subcontractor for the later start date.

48.     Additionally, Wu repeatedly thwarted Ward from performing his duties under the Subcontractor Agreement.

49.     Wu repeatedly throughout the course of the project, also, refused to provide proper drawings and clarifications so Ward could complete its obligation under the Subcontractor Agreement.

50.     Wu repeatedly throughout the course of the project, also, failed to provide adequate water supply, essential for Ward to perform its obligations under the Subcontractor Agreement.

51.     Wu, also, repeatedly prevented Ward from starting and completing various duties under the Subcontractor Agreement because other work within the dominion and control of Wu was incomplete, unfinished and/or improperly scheduled by Wu.

52.     Wu, also, repeatedly refused to attend meetings with Ward and various masonry material providers concerning masonry issues and concerns.

<u>53.</u>     <u>As a direct and proximate result of the aforementioned delays and mismanagement, Ward has also suffered over $202,998.55 in delay damages, increased costs and lost revenue.</u>

54.     The above foregoing conduct by Wu was willful, malicious, done in bad faith and

designed to coerce Ward to surrender his legal rights, with the intent to wrongfully terminate Ward from the project.

**WHEREFORE**, Brendan Ward Masonry, Inc. demands judgment in its favor and against Defendant, Wu & Associates, Inc., in excess of $1,206,000.69 together with interest and costs, attorney's fees, delay damages, consequential damages and punitive damages where appropriate.

### COUNT V
### (Unjust Enrichment)

55.     Plaintiff, Ward, hereby incorporates paragraphs 1 through 54 as though same were fully set forth at length herein.

56.     Wu, unjustly back charged the aforementioned stone walls and piers and then hired outside laborers at a reduced rate to finish the stone walls and piers in direct contravention of the Subcontractor Agreement.

57.     As a direct and proximate result of the above action, Wu realized a windfall profit of over $11,630.00 which unjustly enriched Wu to Ward's detriment.

58.     As subcontractor to Wu on the aforementioned project, Ward also suffered considerable losses as a result of Wu's substantial and indefinite delays and Wu's inability to perform its obligations under the Subcontractor Agreement.

59.     As general contractor to the written contract with the Department of Labor for the United States of America on the aforementioned Wilmington Job Corp Center project, has received substantial amounts of money from the United States Government pursuant to the contract and various claims against said contract.

60.     Upon information and belief, Ward as subcontractor to Wu on the project, is not

entitled to pursue administrative claims before the United States Court of Claims.

61.    Any and all compensation received by Wu as a result of any final payments or claims adjudicated pursuant to the contract, which are directly or indirectly related to the services performed by Ward pursuant to the Subcontractor Agreement between Wu and Ward, has unjustly enriched Wu to Ward's detriment.

**WHEREFORE**, Brendan Ward Masonry, Inc. demands judgment in its favor and against Defendant, Wu & Associates, Inc., in excess of $1,206,000.69 together with interest and costs, attorney's fees, delay damages, consequential damages and punitive damages where appropriate.

## COUNT VI
### (Quantum Meruit)

62.    Plaintiff, Ward, hereby incorporates paragraphs 1 through 61 as though same were fully set forth at length herein.

63.    The original Subcontractor Agreement between Wu and Ward for the aforementioned federal project provided for a maximum contract price of $950,000.00.

64.    This amount was to be supplemented and modified by various "Change Orders."

65.    Ward performed various services at the request of Wu for the aforementioned federal project which were above and beyond the scope of those services specifically enumerated in the Subcontractor Agreement.

66.    Ward performed these services with the explicit understanding that Wu would pay for said services by way of various Change Orders.

67.    At Wu's request, pursuant to the aforementioned understanding, Ward submitted $42,934.00 in Change Orders and Additions. A true and correct chronological compilation of the

Unapproved Change Orders/Additions to the original agreement is attached hereto and incorporated herein as Exhibit E.

68.     Wu has refused to approve and pay for these additional services causing Ward to sustain additional damages in excess of $42,934.00.

**WHEREFORE**, Brendan Ward Masonry, Inc. demands judgment in its favor and against Defendant, Wu & Associates, Inc., in excess of $1,206,000.69 together with interest and costs, attorney's fees, delay damages, consequential damages and punitive damages where appropriate.

<u>**COUNT VII**</u>
<u>**(Destruction of Business)**</u>

69.     Plaintiff, Ward, hereby incorporates paragraphs 1 through 68 as though same were fully set forth at length herein.

70.     The original Subcontractor Agreement between Wu and Ward for the aforementioned federal project ["Project"] provided for a maximum contract price of $950,000.00.

71.      In addition to the original $950,000.00 contracted price, Wu also approved $3,861.84 in Change Orders during the course of the Project. See Exhibit C.

72.     Ward substantially performed its obligations under the Subcontractor Agreement.

73.     Wu has only paid Ward $846,063.67 on the original Subcontractor Agreement and aforementioned Approved Change Orders and has also failed and refused to perform its other duties under the Subcontractor Agreement, causing Ward to suffer substantial losses and financial hardship.

74.     After Ward started performing on the contract, Wu unjustly and without explanation, submitted various back charges and/or change orders removing previously agreed to

items from the Subcontractor Agreement, including, but not limited to, various stone piers and walls.

75.     These changes unjustly reduced the Subcontractor Agreement by $81,031.54. See Exhibit D.

76.     Wu's unjustified reductions to the Subcontractor's Agreement caused Ward to suffer a significant loss of profit and severe financial distress.

77.     Ward also performed various services at the request of Wu for the Project which were above and beyond the scope of those services specifically enumerated in the Subcontractor Agreement.

78.     Ward performed these services with the explicit understanding that Wu would pay for said services by way of various change orders and additions.

79.     At Wu's request, pursuant to the aforementioned understanding, Ward submitted $42,934.00 in change orders and additions for payment for these services. See Exhibit E.

80.     Wu refused to approve Ward's change orders and additions for payment.

81.     Wu's unjustified refusal to approve the change orders and additions for payment has caused Ward to suffer a significant loss of profit and severe financial distress.

82.     Pursuant to the Subcontractor Agreement, Ward was supposed to start on the project in June 2002.

83.     Ward justifiedly relied upon the June 2002 starting date in scheduling work for its other customers.

84.     Wu knew or should have known that he would not be ready for Ward to begin work on the project in June 2002.

85.     Wu's unjustifiable delays, prevented Ward from beginning work on the Project

and forced Ward to cancel and/or not schedule other profitable work during the significant delay period.

86.    Wu's willful and or intentional deficiencies in managing the Project, directly effected Ward's ability to work on the project causing Ward to allocate an inordinate amount of time, workers, equipment and resources which normally would have been allocated to Ward's other customers.

87.    Wu's actions have caused Ward to suffer over $202,998.55 in additional financial hardships including, but not limited to:

      a.    Extended overhead;

      b.    Additional production costs;

      c.    Additional forklift operator costs;

      d.    Additional forklift and mixer rentals;

      e.    Additional scaffolding equipment costs;

      f.    Additional trailer rental costs;

      g.    Mandatory Union Wage Increase; and

      h.    the penalties and associated costs of cash flow shortages.

88.    In reliance on the aforementioned Tolling Agreement, Ward also withdrew and dismissed its claims against Wu's Surety pending in the United States Federal Court for the District of Delaware in anticipation of arbitrating its claims in a timely manor.

89.    Wu's refusal to abide by the tolling agreement and arbitrate Ward's claims has caused Ward to suffer severe financial hardships including but not limited to the loss of monies owed under the claim, the loss of over $65,234.34 in pre-judgment interest due on the claim pursuant to N.J.R. 4:42-11 and increased costs and attorneys' fees.

90.     As the direct result and proximate result of the above actions, Ward has suffered irreparable damage to its business including, but not limited to, loss of production, lost profits, substantial cash shortages and a loss of reputation in the business community.

91.     Prior to the above actions, Brendan Ward Masonry, Inc. was valued in excess of $500,000.00.

92.     As a direct and proximate result of the above actions, Ward has suffered the irreparable destruction and total devaluation of its business.

**WHEREFORE**, Plaintiff, Brendan Ward Masonry, Inc., hereby demands judgment in its favor and against Defendant, Wu & Associates, Inc., in excess of $1,206,000.69 together with interest and costs, attorney's fees, delay damages, consequential damages and punitive damages where appropriate.

**ABER, GOLDLUST, BAKER & OVER**

_____

**PERRY F. GOLDLUST, ESQUIRE (DSB #770)**
702 King Street, Ste. 600
P.O. Box 1675
Wilmington, DE 19899-1675
(302) 472-4900; (302) 472-4920 (FAX)
pgoldlust@gablawde.com
*Attorney for Plaintiff Brendan Ward Masonry, Inc.*

**DATED:**

**Of Counsel:**

JOHN E. HILSER, ESQUIRE
DEVLIEGER HILSER, P.C.
1518 Walnut Street, 16th Floor
Philadelphia, PA 19102
(215) 735-9181; (215) 735-9186 (FAX)
jhilser@dvhlaw.com
F:\Brendan Ward.110\Willimington Job.001\plds\USDC Delaware\Second Amended Complaint(underlined).wpd

**EXHIBIT "A" (PART 1)**

1 /7 EDITION

## AIA DOCUMENT A401-1997

*Standard Form of Agreement Between Contractor and Subcontractor*

Subcontract 0102-25

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

This document has been approved and endorsed by the American Subcontractors Association and the Associated Specialty Contractors, Inc.

**A G R E E M E N T** made as of the  5th (fifth)   day of April
in the year 2002 (Two Thousand Two).
*(In words, indicate day, month and year)*

**B E T W E E N** the Contractor:   Wu & Associates, Inc.
*(Name, address and other information)*  597 Deer Road
Cherry Hill, NJ 08034

and the Subcontractor:     Brendan Ward Masonry, Inc.
*(Name, address and other information)*  345 Oak Terrace
Radnor, PA 19087
P.O.C. Brendan Ward
Tel: 610-293-7661  Fax: 610-971-2181

The Contractor has made a contract for construction dated
September 28, 2001

With the Owner:
*(Name, address and other information)*   U.S. Department of Labor
Division of Contract Services
200 Constitution Avenue, N.W.
Room S - 4203
Washington, DC 20210

For the following Project:
*(Include detailed description of Project, location and address)*

Wilmington Job Corps Center
9 Vandever Avenue
Wilmington, DE 19802

which Contract is hereinafter referred to as the Prime Contract and which provides for the furnishing of labor, materials, equipment and services in connection with the construction of the Project. A copy of the Prime Contract, consisting of the Agreement Between Owner and Contractor (from which compensation amounts may be deleted) and the other Contract Documents enumerated therein has been made available to the Subcontractor.

The Architect for the Project is:   Tevebaugh Associates
*(Name, address and other information)*  2 Mill Road, Suite 210
Wilmington, DE 19806

The Contractor and the Subcontractor agree as follows



© 1997  A I A ®
**AIA DOCUMENT A401-1997**
CONTRACTOR-
SUBCONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

Copyright 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. **WARNING:** Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

## ARTICLE 1  THE SUBCONTRACT DOCUMENTS

1.1    The Subcontract Documents consist of (1) this Agreement; (2) the Prime Contract, consisting of the Agreement between the Owner and Contractor and the other Contract Documents enumerated therein; (3) Modifications issued subsequent to the execution of the Agreement between the Owner and Contractor, whether before or after the execution of this Agreement; (4) other documents listed in Article 16 of this Agreement; and (5) Modifications to this Subcontract issued after execution of this Agreement. These form the Subcontract, and are as fully a part of the Subcontract as if attached to this Agreement or repeated herein. The Subcontract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. An enumeration of the Subcontract Documents, other than Modifications issued subsequent to the execution of this Agreement, appears in Article 16.

1.2    Except to the extent of a conflict with a specific term or condition contained in the Subcontract Documents, the General Conditions governing this Subcontract shall be the edition of AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement.

1.3    The Subcontract may be amended or modified only by a Modification. The Subcontract Documents shall not be construed to create a contractual relationship of any kind (1) between the Architect and the Subcontractor, (2) between the Owner and the Subcontractor, or (3) between any persons or entities other than the Contractor and Subcontractor.

1.4    The Subcontractor shall be furnished copies of the Subcontract Documents upon request, but the Contractor may charge the Subcontractor for the reasonable cost of reproduction.

## ARTICLE 2  MUTUAL RIGHTS AND RESPONSIBILITIES

2.1    The Contractor and Subcontractor shall be mutually bound by the terms of this Agreement and, to the extent that the provisions of the edition of AIA Document A201 current as of the date of this Agreement apply to this Agreement pursuant to Paragraph 1.2 and provisions of the Prime Contract apply to the Work of the Subcontractor, the Contractor shall assume toward the Subcontractor all obligations and responsibilities that the Owner, under such documents, assumes toward the Contractor, and the Subcontractor shall assume toward the Contractor all obligations and responsibilities which the Contractor, under such documents, assumes toward the Owner and the Architect. The Contractor shall have the benefit of all rights, remedies and redress against the Subcontractor which the Owner, under such documents, has against the Contractor, and the Subcontractor shall have the benefit of all rights, remedies and redress against the Contractor which the Contractor, under such documents, has against the Owner, insofar as applicable to this Subcontract. Where a provision of such documents is inconsistent with a provision of this Agreement, this Agreement shall govern.

2.2    The Contractor may require the Subcontractor to enter into agreements with Sub-subcontractors performing portions of the Work of this Subcontract by which the Subcontractor and the Sub-subcontractor are mutually bound, to the extent of the Work to be performed by the Sub-subcontractor, assuming toward each other all obligations and responsibilities which the Contractor and Subcontractor assume toward each other and having the benefit of all rights, remedies and redress each against the other which the Contractor and Subcontractor have by virtue of the provisions of this Agreement.



© 1997   A I A ®
**AIA DOCUMENT A401-1997**
CONTRACTOR-
SUBCONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292



WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

## ARTICLE 3  CONTRACTOR

**3.1    SERVICES PROVIDED BY THE CONTRACTOR**

**3.1.1**    The Contractor shall cooperate with the Subcontractor in scheduling and performing the Contractor's Work to avoid conflicts or interference in the Subcontractor's Work and shall expedite responses to submittals made by the Subcontractor in accordance with Paragraph 4.1 and Article 5. As soon as practicable after execution of this Agreement, the Contractor shall provide the Subcontractor copies of the Contractor's construction schedule and schedule of submittals, together with such additional scheduling details as will enable the Subcontractor to plan and perform the Subcontractor's Work properly. The Subcontractor shall be notified promptly of subsequent changes in the construction and submittal schedules and additional scheduling details.

**3.1.2**    The Contractor shall provide suitable areas for storage of the Subcontractor's materials and equipment during the course of the Work. Additional costs to the Subcontractor resulting from relocation of such facilities at the direction of the Contractor, except as previously agreed upon, shall be reimbursed by the Contractor.

**3.1.3**    Except as provided in Article 14, the Contractor's equipment will be available to the Subcontractor only at the Contractor's discretion and on mutually satisfactory terms.

**3.2    COMMUNICATIONS**

**3.2.1**    The Contractor shall promptly make available to the Subcontractor information, including information received from the Owner, which affects this Subcontract and which becomes available to the Contractor subsequent to execution of this Subcontract.

**3.2.2**    The Contractor shall not give instructions or orders directly to the Subcontractor's employees or to the Subcontractor's Sub-subcontractors or material suppliers unless such persons are designated as authorized representatives of the Subcontractor.

**3.2.3**    The Contractor shall permit the Subcontractor to request directly from the Architect information regarding the percentages of completion and the amount certified on account of Work done by the Subcontractor.

**3.2.4**    If hazardous substances of a type of which an employer is required by law to notify its employees are being used on the site by the Contractor, a subcontractor or anyone directly or indirectly employed by them (other than the Subcontractor), the Contractor shall, prior to harmful exposure of the Subcontractor's employees to such substance, give written notice of the chemical composition thereof to the Subcontractor in sufficient detail and time to permit the Subcontractor's compliance with such laws.

**3.2.5**    The Contractor shall furnish to the Subcontractor within 30 days after receipt of a written request, or earlier if so required by law, information necessary and relevant for the Subcontractor to evaluate, give notice of or enforce mechanic's lien rights. Such information shall include a correct statement of the record legal title to the property, usually referred to as the site, on which the Project is located and the Owner's interest therein.

**3.2.6**    If the Contractor asserts or defends a claim against the Owner which relates to the Work of the Subcontractor, the Contractor shall make available to the Subcontractor information relating to that portion of the claim which relates to the Work of the Subcontractor.

**3.3    CLAIMS BY THE CONTRACTOR**

**3.3.1**    Liquidated damages for delay, if provided for in Paragraph 9.3 of this Agreement, shall be assessed against the Subcontractor only to the extent caused by the Subcontractor or any person or entity for whose acts the Subcontractor may be liable, and in no case for delays or causes arising outside the scope of this Subcontract.



©1997  AIA®
AIA DOCUMENT A401-1997
CONTRACTOR-
SUBCONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington D.C. 20006-5292

**WARNING:** Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

3.3.2    The Contractor's claims for services or materials provided the Subcontractor shall require:

.1  seven days' prior written notice except in an emergency;

.2  written compilations to the Subcontractor of services and materials provided and charges for such services and materials no later than the fifteenth day of the following month.

### 3.4    CONTRACTOR'S REMEDIES

3.4.1    If the Subcontractor defaults or neglects to carry out the Work in accordance with this Agreement and fails within three working days after receipt of written notice from the Contractor to commence and continue correction of such default or neglect with diligence and promptness, the Contractor may, after three days following receipt by the Subcontractor of an additional written notice, and without prejudice to any other remedy the Contractor may have, make good such deficiencies and may deduct the reasonable cost thereof from the payments then or thereafter due the Subcontractor.

## ARTICLE 4  SUBCONTRACTOR

### 4.1    EXECUTION AND PROGRESS OF THE WORK

4.1.1    The Subcontractor shall supervise and direct the Subcontractor's Work, and shall cooperate with the Contractor in scheduling and performing the Subcontractor's Work to avoid conflict, delay in or interference with the Work of the Contractor, other subcontractors or Owner's own forces.

4.1.2    The Subcontractor shall promptly submit Shop Drawings, Product Data, Samples and similar submittals required by the Subcontract Documents with reasonable promptness and in such sequence as to cause no delay in the Work or in the activities of the Contractor or other subcontractors.

4.1.3    The Subcontractor shall submit to the Contractor a schedule of values allocated to the various parts of the Work of this Subcontract, aggregating the Subcontract Sum, made out in such detail as the Contractor and Subcontractor may agree upon or as required by the Owner, and supported by such evidence as the Contractor may require. In applying for payment, the Subcontractor shall submit statements based upon this schedule.

4.1.4    The Subcontractor shall furnish to the Contractor periodic progress reports on the Work of this Subcontract as mutually agreed, including information on the status of materials and equipment which may be in the course of preparation, manufacture or transit.

4.1.5    The Subcontractor agrees that the Contractor and the Architect will each have the authority to reject Work of the Subcontractor which does not conform to the Prime Contract. The Architect's decisions on matters relating to aesthetic effect shall be final and binding on the Subcontractor if consistent with the intent expressed in the Prime Contract.

4.1.6    The Subcontractor shall pay for all materials, equipment and labor used in connection with the performance of this Subcontract through the period covered by previous payments received from the Contractor, and shall furnish satisfactory evidence, when requested by the Contractor, to verify compliance with the above requirements.

4.1.7    The Subcontractor shall take necessary precautions to protect properly the Work of other subcontractors from damage caused by operations under this Subcontract.

4.1.8    The Subcontractor shall cooperate with the Contractor, other subcontractors and the Owner's own forces whose Work might interfere with the Subcontractor's Work. The



© 1997    A I A ®
AIA DOCUMENT A401-1997
CONTRACTOR-
SUBCONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

Subcontractor shall participate in the preparation of coordinated drawings in areas of congestion, if required by the Prime Contract, specifically noting and advising the Contractor of potential conflicts between the Work of the Subcontractor and that of the Contractor, other subcontractors or the Owner's own forces.

**4.2     LAWS, PERMITS, FEES AND NOTICES**

**4.2.1**   The Subcontractor shall give notices and comply with laws, ordinances, rules, regulations and orders of public authorities bearing on performance of the Work of this Subcontract. The Subcontractor shall secure and pay for permits and governmental fees, licenses and inspections necessary for proper execution and completion of the Subcontractor's Work, the furnishing of which is required of the Contractor by the Prime Contract.

**4.2.2**   The Subcontractor shall comply with Federal, state and local tax laws, social security acts, unemployment compensation acts and workers' compensation acts insofar as applicable to the performance of this Subcontract.

**4.3     SAFETY PRECAUTIONS AND PROCEDURES**

**4.3.1**   The Subcontractor shall take reasonable safety precautions with respect to performance of this Subcontract, shall comply with safety measures initiated by the Contractor and with applicable laws, ordinances, rules, regulations and orders of public authorities for the safety of persons and property in accordance with the requirements of the Prime Contract. The Subcontractor shall report to the Contractor within three days an injury to an employee or agent of the Subcontractor which occurred at the site.

**4.3.2**   If hazardous substances of a type of which an employer is required by law to notify its employees are being used on the site by the Subcontractor, the Subcontractor's Sub-subcontractors or anyone directly or indirectly employed by them, the Subcontractor shall, prior to harmful exposure of any employees on the site to such substance, give written notice of the chemical composition thereof to the Contractor in sufficient detail and time to permit compliance with such laws by the Contractor, other subcontractors and other employers on the site.

**4.3.3**   If reasonable precautions will be inadequate to prevent foreseeable bodily injury or death to persons resulting from a material or substance, including but not limited to asbestos or polychlorinated biphenyl (PCB), encountered on the site by the Subcontractor, the Subcontractor shall, upon recognizing the condition, immediately stop Work in the affected area and report the condition to the Contractor in writing. When the material or substance has been rendered harmless, the Subcontractor's Work in the affected area shall resume upon written agreement of the Contractor and Subcontractor. The Subcontract Time shall be extended appropriately and the Subcontract Sum shall be increased in the amount of the Subcontractor's reasonable additional costs of demobilization, delay and remobilization, which adjustments shall be accomplished as provided in Article 5 of this Agreement.

**4.3.4**   To the fullest extent permitted by law, the Contractor shall indemnify and hold harmless the Subcontractor, the Subcontractor's Sub-subcontractors, and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work in the affected area if in fact the material or substance presents the risk of bodily injury or death as described in Subparagraph 4.3.3 and has not been rendered harmless, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) including loss of use resulting therefrom and provided that such damage, loss or expense is not due to the sole negligence of a party seeking indemnity.



© 1 9 9 7   A I A ®
AIA DOCUMENT A401-1997
CONTRACTOR-
SUBCONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292



WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

**4.4 CLEANING UP**

**4.4.1** The Subcontractor shall keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by operations performed under this Subcontract. The Subcontractor shall not be held responsible for unclean conditions caused by other contractors or subcontractors.

**4.4.2** As provided under Subparagraph 3.3.2, if the Subcontractor fails to clean up as provided in the Subcontract Documents, the Contractor may charge the Subcontractor for the Subcontractor's appropriate share of cleanup costs.

**4.5 WARRANTY**

**4.5.1** The Subcontractor warrants to the Owner, Architect and Contractor that materials and equipment furnished under this Subcontract will be of good quality and new unless otherwise required or permitted by the Subcontract Documents, that the Work of this Subcontract will be free from defects not inherent in the quality required or permitted, and that the Work will conform to the requirements of the Subcontract Documents. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. The Subcontractor's warranty excludes remedy for damage or defect caused by abuse, modifications not executed by the Subcontractor, improper or insufficient maintenance, improper operation, or normal wear and tear under normal usage. This warranty shall be in addition to and not in limitation of any other warranty or remedy required by law or by the Subcontract Documents.

**4.6 INDEMNIFICATION**

**4.6.1** To the fullest extent permitted by law, the Subcontractor shall indemnify and hold harmless the Owner, Contractor, Architect, Architect's consultants, and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from performance of the Subcontractor's Work under this Subcontract, provided that any such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself), but only to the extent caused by the negligent acts or omissions of the Subcontractor, the Subcontractor's Sub-subcontractors, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, abridge, or otherwise reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Paragraph 4.6.

**4.6.2** In claims against any person or entity indemnified under this Paragraph 4.6 by an employee of the Subcontractor, the Subcontractor's Sub-subcontractors, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, the indemnification obligation under Subparagraph 4.6.1 shall not be limited by a limitation on the amount or type of damages, compensation or benefits payable by or for the Subcontractor or the Subcontractor's Sub-subcontractors under workers' compensation acts, disability benefit acts or other employee benefit acts.

**4.7 REMEDIES FOR NONPAYMENT**

**4.7.1** If the Contractor does not pay the Subcontractor through no fault of the Subcontractor, within seven days from the time payment should be made as provided in this Agreement, the Subcontractor may, without prejudice to any other available remedies, upon seven additional days' written notice to the Contractor, stop the Work of this Subcontract until payment of the amount owing has been received. The Subcontract Sum shall, by appropriate adjustment, be increased by the amount of the Subcontractor's reasonable costs of demobilization, delay and remobilization.



©1997  AIA®
AIA DOCUMENT A401-1997
CONTRACTOR-
SUBCONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

## ARTICLE 5  CHANGES IN THE WORK

**5.1**    The Owner may make changes in the Work by issuing Modifications to the Prime Contract. Upon receipt of such a Modification issued subsequent to the execution of the Subcontract Agreement, the Contractor shall promptly notify the Subcontractor of the Modification. Unless otherwise directed by the Contractor, the Subcontractor shall not thereafter order materials or perform Work which would be inconsistent with the changes made by the Modifications to the Prime Contract.

**5.2**    The Subcontractor may be ordered in writing by the Contractor, without invalidating this Subcontract, to make changes in the Work within the general scope of this Subcontract consisting of additions, deletions or other revisions, including those required by Modifications to the Prime Contract issued subsequent to the execution of this Agreement, the Subcontract Sum and the Subcontract Time being adjusted accordingly. The Subcontractor, prior to the commencement of such changed or revised Work, shall submit promptly to the Contractor written copies of a claim for adjustment to the Subcontract Sum and Subcontract Time for such revised Work in a manner consistent with requirements of the Subcontract Documents.

**5.3**    The Subcontractor shall make all claims promptly to the Contractor for additional cost, extensions of time and damages for delays or other causes in accordance with the Subcontract Documents. A claim which will affect or become part of a claim which the Contractor is required to make under the Prime Contract within a specified time period or in a specified manner shall be made in sufficient time to permit the Contractor to satisfy the requirements of the Prime Contract. Such claims shall be received by the Contractor not less than two working days preceding the time by which the Contractor's claim must be made. Failure of the Subcontractor to make such a timely claim shall bind the Subcontractor to the same consequences as those to which the Contractor is bound.

## ARTICLE 6  MEDIATION AND ARBITRATION

~~**6.1**    MEDIATION~~

~~**6.1.1**    Any claim arising out of or related to this Subcontract, except claims as otherwise provided in Subparagraph 4.1.5 and except those waived in this Subcontract, shall be subject to mediation as a condition precedent to arbitration or the institution of legal or equitable proceedings by either party.~~

~~**6.1.2**    The parties shall endeavor to resolve their claims by mediation which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Mediation Rules of the American Arbitration Association currently in effect. Request for mediation shall be filed in writing with the other party to this Subcontract and the American Arbitration Association. The request may be made concurrently with the filing of a demand for arbitration but, in such event, mediation shall proceed in advance of arbitration or legal or equitable proceedings, which shall be stayed pending mediation for a period of 60 days from the date of filing, unless stayed for a longer period by agreement of the parties or court order.~~

~~**6.1.3**    The parties shall share the mediator's fee and any filing fees equally. The mediation shall be held in the place where the Project is located, unless another location is mutually agreed upon. Agreements reached in mediation shall be enforceable as settlement agreements in any court having jurisdiction thereof.~~

**6.2**    ARBITRATION

**6.2.1**    Any claim arising out of or related to this Subcontract, except claims as otherwise provided in Subparagraph 4.1.5 and except those waived in this Subcontract, shall be subject to arbitration. ~~Prior to arbitration, the parties shall endeavor to resolve disputes by mediation in accordance with the provisions of Paragraph 6.1.~~



© 1997  A I A®
AIA DOCUMENT A401-1997
CONTRACTOR-
SUBCONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

**WARNING:** Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

6.2.2   Claims not resolved by mediation shall be decided by arbitration which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect. Demand for arbitration shall be filed in writing with the other party to this Subcontract and with the American Arbitration Association, and a copy shall be filed with the Architect.

6.2.3   A demand for arbitration shall be made within the time limits specified in the conditions of the Prime Contract as applicable, and in other cases within a reasonable time after the claim has arisen, and in no event shall it be made after the date when institution of legal or equitable proceedings based on such claim would be barred by the applicable statute of limitations.

6.2.4   Limitation on Consolidation or Joinder. Except by written consent of the person or entity sought to be joined, no arbitration arising out of or relating to the Subcontract shall include, by consolidation or joinder or in any other manner, any person or entity not a party to the Subcontract under which such arbitration arises, unless it is shown at the time the demand for arbitration is filed that (1) such person or entity is substantially involved in a common question of fact or law, (2) the presence of such person or entity is required if complete relief is to be accorded in the arbitration, (3) the interest or responsibility of such person or entity in the matter is not insubstantial, and (4) such person or entity is not the Architect, the Architect's employee, the Architect's consultant, or an employee or agent of any of them. This agreement to arbitrate and any other written agreement to arbitrate with an additional person or persons referred to herein shall be specifically enforceable under applicable law in any court having jurisdiction thereof.

6.2.5   Claims and Timely Assertion of Claims. The party filing a notice of demand for arbitration must assert in the demand all claims then known to that party on which arbitration is permitted to be demanded.

6.2.6   Judgment on Final Award. The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

## ARTICLE 7   TERMINATION, SUSPENSION OR ASSIGNMENT OF THE SUBCONTRACT

### 7.1   TERMINATION BY THE SUBCONTRACTOR

7.1.1   The Subcontractor may terminate the Subcontract for the same reasons and under the same circumstances and procedures with respect to the Contractor as the Contractor may terminate with respect to the Owner under the Prime Contract, or for nonpayment of amounts due under this Subcontract for 60 days or longer. In the event of such termination by the Subcontractor for any reason which is not the fault of the Subcontractor, Sub-subcontractors or their agents or employees or other persons performing portions of the Work under contract with the Subcontractor, the Subcontractor shall be entitled to recover from the Contractor payment for Work executed and for proven loss with respect to materials, equipment, tools, and construction equipment and machinery, including reasonable overhead, profit and damages.

### 7.2   TERMINATION BY THE CONTRACTOR

7.2.1   If the Subcontractor persistently or repeatedly fails or neglects to carry out the Work in accordance with the Subcontract Documents or otherwise to perform in accordance with this Subcontract and fails within seven days after receipt of written notice to commence and continue correction of such default or neglect with diligence and promptness, the Contractor may, after seven days following receipt by the Subcontractor of an additional written notice and without prejudice to any other remedy the Contractor may have, terminate the Subcontract and finish the Subcontractor's Work by whatever method the Contractor may deem expedient. If the



© 1997  AIA ©
AIA DOCUMENT A401-1997
CONTRACTOR-
SUBCONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

unpaid balance of the Subcontract Sum exceeds the expense of finishing the Subcontractor's Work and other damages incurred by the Contractor and not expressly waived, such excess shall be paid to the Subcontractor. If such expense and damages exceed such unpaid balance, the Subcontractor shall pay the difference to the Contractor.

**7.2.2** If the Owner terminates the Contract for the Owner's convenience, the Contractor shall deliver written notice to the Subcontractor.

**7.2.3** Upon receipt of written notice of termination, the Subcontractor shall:

   .1 cease operations as directed by the Contractor in the notice;

   .2 take actions necessary, or that the Contractor may direct, for the protection and preservation of the Work; and

   .3 except for Work directed to be performed prior to the effective date of termination stated in the notice, terminate all existing Sub-subcontracts and purchase orders and enter into no further Sub-subcontracts and purchase orders.

**7.2.4** In case of such termination for the Owner's convenience, the Subcontractor shall be entitled to receive payment for Work executed, and costs incurred by reason of such termination, along with reasonable overhead and profit on the Work not executed.

**7.3** **SUSPENSION BY THE CONTRACTOR FOR CONVENIENCE**

**7.3.1** The Contractor may, without cause, order the Subcontractor in writing to suspend, delay or interrupt the Work of this Subcontract in whole or in part for such period of time as the Contractor may determine. In the event of suspension ordered by the Contractor, the Subcontractor shall be entitled to an equitable adjustment of the Subcontract Time and Subcontract Sum.

**7.3.2** An adjustment shall be made for increases in the Subcontract Time and Subcontract Sum, including profit on the increased cost of performance, caused by suspension, delay or interruption. No adjustment shall be made to the extent:

   .1 that performance is, was or would have been so suspended, delayed or interrupted by another cause for which the Subcontractor is responsible;

   .2 that an equitable adjustment is made or denied under another provision of this Subcontract.

**7.4** **ASSIGNMENT OF THE SUBCONTRACT**

**7.4.1** In the event of termination of the Prime Contract by the Owner, the Contractor may assign this Subcontract to the Owner, with the Owner's agreement, subject to the provisions of the Prime Contract and to the prior rights of the surety, if any, obligated under bonds relating to the Prime Contract. In such event, the Owner shall assume the Contractor's rights and obligations under the Subcontract Documents. If the Work of the Prime Contract has been suspended for more than 30 days, the Subcontractor's compensation shall be equitably adjusted.

**7.4.2** The Subcontractor shall not assign the Work of this Subcontract without the written consent of the Contractor, nor subcontract the whole of this Subcontract without the written consent of the Contractor, nor further subcontract portions of this Subcontract without written notification to the Contractor when such notification is requested by the Contractor.



©1997  A I A ®
AIA DOCUMENT A401-1997
CONTRACTOR-
SUBCONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292



WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

## ARTICLE 8  THE WORK OF THIS SUBCONTRACT

8.1    The Subcontractor shall execute the following portion of the Work described in the Subcontract Documents, including all labor, materials, equipment, services and other items required to complete such portion of the Work, except to the extent specifically indicated in the Subcontract Documents to be the responsibility of others.

*(Insert a precise description of the Work of this Subcontract, referring where appropriate to numbers of Drawings, sections of Specifications and pages of Addenda, Modifications and accepted Alternates.)*

        See Scope of Work under "Addendum to Contract"

## ARTICLE 9  DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

9.1    The Subcontractor's date of commencement is the date from which the Contract Time of Paragraph 5.3 is measured; it shall be the date of this Agreement, as first written above, unless a different date is stated below or provision is made for the date to be fixed in a notice to proceed issued by the Contractor.

*(Insert the date of commencement, if it differs from the date of this Agreement or, if applicable, state that the date will be fixed in a notice to proceed.)*

The date will be fixed when final progress schedule is approved by Owner.

9.2    Unless the date of commencement is established by a notice to proceed issued by the Contractor, or the Contractor has commenced visible Work at the site under the Prime Contract, the Subcontractor shall notify the Contractor in writing not less than five days before commencing the Subcontractor's Work to permit the timely filing of mortgages, mechanic's liens and other security interests.

9.3    The Work of this Subcontract shall be substantially completed not later than To Be Determined

*(Insert the calendar date or number of calendar days after the Subcontractor's date of commencement. Also insert any requirements for earlier Substantial Completion of certain portions of the Subcontractor's Work, if not stated elsewhere in the Subcontract Documents.)*

, subject to adjustments of this Subcontract Time as provided in the Subcontract Documents.

*(Insert provisions, if any, for liquidated damages relating to failure to complete on time.)*

9.4    With respect to the obligations of both the Contractor and the Subcontractor, time is of the essence of this Subcontract.

9.5    No extension of time will be valid without the Contractor's written consent after claim made by the Subcontractor in accordance with Paragraph 5.3.



© 1997   A I A ®

AIA DOCUMENT A401-1997
CONTRACTOR-
SUBCONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292



WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

**ARTICLE 10 SUBCONTRACT SUM**

10.1    The Contractor shall pay the Subcontractor in current funds for performance of the
Subcontract the Subcontract Sum of   Nine Hundred & Fifty Thousand and 00/100
Dollars ($ 950,000.00            ), subject to additions and deductions as provided in the
Subcontract Documents.

10.2    The Subcontract Sum is based upon the following alternates, if any, which are described in
the Subcontract Documents and have been accepted by the Owner and the Contractor:
*(Insert the numbers or other identification of accepted alternates.)*

N/A

10.3    Unit prices, if any, are as follows:

N/A

**ARTICLE 11 PROGRESS PAYMENTS**

11.4    If an application for payment is received by the Contractor after the application date fixed above, the Subcontractor's Work covered by it shall be included by the Contractor in the next application for payment submitted to the Architect.

11.5    Each application for payment shall be based upon the most recent schedule of values submitted by the Subcontractor in accordance with the Subcontract Documents. The schedule of values shall allocate the entire Subcontract Sum among the various portions of the Subcontractor's Work and be prepared in such form and supported by such data to substantiate its accuracy as the Contractor may require. This schedule, unless objected to by the Contractor, shall be used as a basis for reviewing the Subcontractor's applications for payment.

11.6    Applications for payment submitted by the Subcontractor shall indicate the percentage of completion of each portion of the Subcontractor's Work as of the end of the period covered by the application for payment.

11.7    Subject to the provisions of the Subcontract Documents, the amount of each progress payment shall be computed as follows:

11.7.1    Take that portion of the Subcontract Sum properly allocable to completed Work as determined by multiplying the percentage completion of each portion of the Subcontractor's Work by the share of the total Subcontract Sum allocated to that portion of the Subcontractor's Work in the schedule of values, less that percentage actually retained, if any, from payments to the Contractor on account of the Work of the Subcontractor. Pending final determination of cost to the Contractor of changes in the Work which have been properly authorized by the Contractor, amounts not in dispute shall be included to the same extent provided in the Prime Contract, even though the Subcontract Sum has not yet been adjusted;

11.7.2    Add that portion of the Subcontract Sum properly allocable to materials and equipment delivered and suitably stored at the site by the Subcontractor for subsequent incorporation in the Subcontractor's Work or, if approved by the Contractor, suitably stored off the site at a location agreed upon in writing, less the same percentage retainage required by the Prime Contract to be applied to such materials and equipment in the Contractor's application for payment;

11.7.3    Subtract the aggregate of previous payments made by the Contractor; and

11.7.4    Subtract amounts, if any, calculated under Subparagraph 11.7.1 or 11.7.2 which are related to Work of the Subcontractor for which the Architect has withheld or nullified, in whole or in part, a certificate of payment for a cause which is the fault of the Subcontractor.

11.8    Upon the partial or entire disapproval by the Contractor of the Subcontractor's application for payment, the Contractor shall provide written notice to the Subcontractor. When the basis for the disapproval has been remedied, the Subcontractor shall be paid the amounts withheld.

11.9    **SUBSTANTIAL COMPLETION**

11.9.1    When the Subcontractor's Work or a designated portion thereof is substantially complete and in accordance with the requirements of the Prime Contract, the Contractor shall, upon application by the Subcontractor, make prompt application for payment for such Work. Within 30 days following issuance by the Architect of the certificate for payment covering such substantially completed Work, the Contractor shall, to the full extent allowed in the Prime Contract, make payment to the Subcontractor, deducting any portion of the funds for the Subcontractor's Work withheld in accordance with the certificate to cover costs of items to be completed or corrected by the Subcontractor. Such payment to the Subcontractor shall be the entire unpaid balance of the Subcontract Sum if a full release of retainage is allowed under the



©1997  AIA®
AIA DOCUMENT A401-1997
CONTRACTOR-
SUBCONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

Prime Contract for the Subcontractor's Work prior to the completion of the entire Project. If the Prime Contract does not allow for a full release of retainage, then such payment shall be an amount which, when added to previous payments to the Subcontractor, will reduce the retainage on the Subcontractor's substantially completed Work to the same percentage of retainage as that on the Contractor's Work covered by the certificate.

## ARTICLE 12 FINAL PAYMENT

12.1    Final payment, constituting the entire unpaid balance of the Subcontract Sum, shall be made by the Contractor to the Subcontractor when the Subcontractor's Work is fully performed in accordance with the requirements of the Subcontract Documents, the Architect has issued a certificate for payment covering the Subcontractor's completed Work and the Contractor has received payment from the Owner. If, for any cause which is not the fault of the Subcontractor, a certificate for payment is not issued or the Contractor does not receive timely payment or does not pay the Subcontractor within three working days after receipt of payment from the Owner, final payment to the Subcontractor shall be made upon demand.
*(Insert provisions for earlier final payment to the Subcontractor, if applicable.)*

          See Addendum to Contract.

12.2    Before issuance of the final payment, the Subcontractor, if required, shall submit evidence satisfactory to the Contractor that all payrolls, bills for materials and equipment, and all known indebtedness connected with the Subcontractor's Work have been satisfied.

## ARTICLE 13 INSURANCE AND BONDS

13.1    The Subcontractor shall purchase and maintain insurance of the following types of coverage and limits of liability:

          Per specifications, see also Addendum to Contract.

13.2    Coverages, whether written on an occurrence or claims-made basis, shall be maintained without interruption from date of commencement of the Subcontractor's Work until date of final payment and termination of any coverage required to be maintained after final payment to the Subcontractor.

13.3    Certificates of insurance acceptable to the Contractor shall be filed with the Contractor prior to commencement of the Subcontractor's Work. These certificates and the insurance policies required by this Article 13 shall contain a provision that coverages afforded under the policies will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Contractor. If any of the foregoing insurance coverages are required to remain in force after final payment and are reasonably available, an additional certificate evidencing continuation of such coverage shall be submitted with the final application for payment as required in Article 12. If any information concerning reduction of coverage is not furnished by the insurer, it shall be furnished by the Subcontractor with reasonable promptness according to the Subcontractor's information and belief.



© 1997  A I A ®
**AIA DOCUMENT A401-1997**
CONTRACTOR-
SUBCONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

13.4    The Contractor shall furnish to the Subcontractor satisfactory evidence of insurance required of the Contractor under the Prime Contract.

13.5    The Contractor shall promptly, upon request of the Subcontractor, furnish a copy or permit a copy to be made of any bond covering payment of obligations arising under the Subcontract.

13.6    Performance Bond and Payment Bond:    N/A
*(If the Subcontractor is to furnish bonds, insert the specific requirements here.)*

13.7    **PROPERTY INSURANCE**
13.7.1    When requested in writing, the Contractor shall provide the Subcontractor with copies of the property and equipment policies in effect for the Project. The Contractor shall notify the Subcontractor if the required property insurance policies are not in effect.  General Contractor has carried Builder's Risk insurance for 100% of contract value.
13.7.2    If the required property insurance is not in effect for the full value of the Subcontractor's Work, then the Subcontractor shall purchase insurance for the value of the Subcontractor's Work, and the Subcontractor shall be reimbursed for the cost of the insurance by an adjustment in the Subcontract Sum.

13.7.3    Property insurance for the Subcontractor's materials and equipment required for the Subcontractor's Work, stored off site or in transit and not covered by the Project property insurance, shall be paid for through the application for payment process.    N/A
It is the responsibility of the Sub-contractor.
13.8    **WAIVERS OF SUBROGATION**
13.8.1    The Contractor and Subcontractor waive all rights against (1) each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other, and (2) the Owner, the Architect, the Architect's consultants, separate contractors, and any of their subcontractors, sub-subcontractors, agents and employees for damages caused by fire or other causes of loss to the extent covered by property insurance provided under the Prime Contract or other property insurance applicable to the Work, except such rights as they may have to proceeds of such insurance held by the Owner as a fiduciary. The Subcontractor shall require of the Subcontractor's Sub-subcontractors, agents and employees, by appropriate agreements, written where legally required for validity, similar waivers in favor of the parties enumerated herein. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

## ARTICLE 14 TEMPORARY FACILITIES AND WORKING CONDITIONS
14.1    The Contractor shall furnish and make available to the Subcontractor the following temporary facilities, equipment and services; these shall be furnished at no cost to the Subcontractor unless otherwise indicated below:    N/A



© 1997  A I A ®
**AIA DOCUMENT A401-1997**
CONTRACTOR-
SUBCONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

14

WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

14.2    Specific working conditions:
*(Insert any applicable arrangements concerning working conditions and labor matters for the Project.)*

See Addendum to Contract

## ARTICLE 15 MISCELLANEOUS PROVISIONS

15.1    Where reference is made in this Subcontract to a provision of another Subcontract Document, the reference refers to that provision as amended or supplemented by other provisions of the Subcontract Documents.

15.2    Payments due and unpaid under this Subcontract shall bear interest from the date payment is due at such rate as the parties may agree upon in writing or, in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.
*(Insert rate of interest agreed upon, if any.)*

None

*(Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's, Contractor's and Subcontractor's principal places of business, the location of the Project and elsewhere may affect the validity of this provision. Legal advice should be obtained with respect to deletions or modifications, and also regarding requirements such as written disclosures or waivers.)*

15.3    Retainage and any reduction thereto is as follows:

See Addendum to Contract

15.4    The Contractor and Subcontractor waive claims against each other for consequential damages arising out of or relating to this Subcontract, including without limitation, any consequential damages due to either party's termination in accordance with Article 7.

## ARTICLE 16 ENUMERATION OF SUBCONTRACT DOCUMENTS

16.1    The Subcontract Documents, except for Modifications issued after execution of this Subcontract, are enumerated as follows:

16.1.1    This executed 1997 edition of the Standard Form of Agreement Between Contractor and Subcontractor, AIA Document A401-1997;

16.1.2    The Prime Contract, consisting of the Agreement between the Owner and Contractor dated as first entered above and the other Contract Documents enumerated in the Owner-Contractor Agreement;



© 1997  AIA®
**AIA DOCUMENT A401-1997**
CONTRACTOR-
SUBCONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5252

WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

16.1.3   The following Modifications to the Prime Contract, if any, issued subsequent to the execution of the Owner-Contractor Agreement but prior to the execution of this Agreement:

Modification                                                              Date

     None

16.1.4   Other Documents, if any, forming part of the Subcontract Documents are as follows: *(List any additional documents that are intended to form part of the Subcontract Documents. Requests for proposal and the Subcontractor's bid or proposal should be listed here only if intended to be part of the Subcontract Documents.)*

     None

This Agreement entered into as of the day and year first written above.

CONTRACTOR *(Signature)*                    SUBCONTRACTOR *(Signature)*
Wu & Associates, Inc.                        Brendan Ward Masonry, Inc.

KIRBY WU, VICE PRESIDENT      4/26/02
*(Printed name and title)*                   *(Printed name and title)*



© 1997   A I A ®
AIA DOCUMENT A401-1997
CONTRACTOR-
SUBCONTRACTOR
AGREEMENT

CAUTION: You should sign an original AIA document or a licensed reproduction. Originals contain the AIA logo printed in red; licensed reproductions are those produced in accordance with the Instructions to this document.

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

Wu & Associates, Inc.
597 Deer Road
Cherry Hill, NJ 08034
Tel: 856-857-1639
Fax: 856-857-1729
Email: info@wuassociates.com

PROJECT NO: 0102

SUBCONTRACT NO: 0102-17

## SUBCONTRACT

This subcontract is made this 27th day of March 2002 by and between Wu & Associates, Inc., 597 Deer Road, Cherry Hill, NJ, 08034 ("Contractor") and Brendan Ward Masonry, Inc., 345 Oak Terrace, Radnor, PA 19087, P.O.C. Brendan Ward, Tel: 610-293-7661; Fax 610-971-2131, ("Subcontractor"). Contractor and Subcontractor agree that the date above shall be used to calculate all deadlines stated below. This contract must signed and returned by Subcontractor to Contractor within seven (7) calendar days of the date stated above; otherwise, Contractor, in its sole discretion, may void this agreement.

1. **PARTIES**

   a. The Contractor. Wu and Associates, Inc., 597 Deer Road, Cherry Hill, NJ 08034

   b. The Subcontractor. Brendan Ward Masonry, Inc., 345 Oak Terrace, Radnor, PA 19087

   c. The Owner. US Department of Labor, 200 Constitution Avenue, NW, Room S-4703, Washington DC, 20210

2. **DEFINITIONS**

   a. The term "Contract" as used herein refers to the Contract between the Owner and the Contractor for construction of the Project.

   b. The term "Contract Documents" as used herein refers to the "Contract" between the Owner and the Contractor, together with all plans, drawings, specifications, including the General Conditions, Supplemental General Conditions, and Special Conditions, change orders, bulletins, modifications, Addenda, Amendments, and/or instruments of like effect issued by or on behalf of the Owner; together with any and all other documents or instruments referred to in the aforesaid "Contract" and "Contract Documents" and/or as identified by the Owner's Authorized Agent.

   c. The term "Subcontract" as used herein refers to this Subcontract together with any exhibits, attachments, or addenda incorporated herewith and referred to herein; and in addition any Supplemental Agreements made and entered into by the parties hereto subsequent to the date of execution of this Subcontract.

   d. The term "Subcontract Documents" as used herein refers jointly and/or severally to the aforesaid "Contract," "Contract Documents" and "Subcontract"; together with any and all alternate proposals which may be exercised or incorporated in this Subcontract, all Contract change orders issued by the Owner subsequent to the bidding and identified specifically in this Subcontract; and all written instructions, notices, directives, job schedules, instruments, provided that such written documents are specifically referred to in this Subcontract.

   e. The Subcontract Documents shall not include any bids, proposals, correspondence or agreements dated, made or alleged to have been made between the Contractor and the Subcontractor prior to the date of this Subcontract unless specifically identified and incorporated in writing herein.

   f. In the event of a conflict between this Subcontract and the other Subcontract Documents, this Subcontract shall govern.

EXHIBIT "A" (PART 2)

3. **CONSIDERATION.** For and in consideration of the sum of

**$950,000.00 (NINE HUNDRED FIFTY THOUSAND DOLLARS AND NO CENTS)** which represents the total contract price, subject to additions and deductions for changes agreed upon in writing by both parties to this subcontract, and all sales and other taxes which are included in this subcontract, Subcontractor agrees to furnish all labor, materials, equipment and/or services necessary to perform the scope of work as set forth in the paragraphs below for the construction of

**Wilmington Job Corps Center**
**Wilmington, DE, ("Project")**

being performed for

**US Department of Labor**
**Washington DC 20210 ("Owner")**.
**CONTRACT NO. AE11793-01-20** (hereinafter the "Project"),
and Contractor agrees to pay the consideration stated above to the Subcontractor provided all conditions of this subcontract have been satisfied.

4. **INDEPENDENT CONTRACTOR.** The Contractor subcontracts with the Subcontractor as an "independent contractor" to provide everything necessary to complete the work described herein. Pursuant to this Subcontract, Subcontractor is required to provide all labor, materials, equipment, services, management, supervision, storage facilities, tools, and testing required to perform its scope of work as stated below. Subcontractor agrees to defend Contractor against any claim or assertion of an employer-employee relationship between Contractor and Subcontractor's workmen, and to indemnify and hold Contractor harmless against any expense or liability imposed upon Contractor by reason of a finding of such an employer-employee relationship.

5. **ACKNOWLEDGMENTS.** Subcontractor acknowledges receipt as of the date of this contract of each document described below, and agrees to be bound by the terms of this subcontract as stated as follows:

a. Subcontractor agrees to perform the work in accordance with the contract between Contractor and Owner, including all contract documents and specifications as provided to the Subcontractor and as directed by the site Superintendent and Certified Quality Control Manager, and in accordance with the contract plans and specifications, including but not limited to the specifications attached hereto (hereinafter the "Work").

b. Subcontractor shall be bound to Contractor by the Terms of the Subcontract and the Contract Documents, and shall be bound to Contractor to assume the same obligations which Contractor must assume to Owner. The Contract Documents are incorporated herein by reference. Subcontractor undertakes to perform all the duties of the Contractor under the Contract Documents, insofar as said duties are related, directly or indirectly, to the work described in this Subcontract. Subcontractor will not do, or fail to do, any act, if by reason of such act or failure to act, Contractor would be in breach of the Contract.

c. Even if specific work set forth in the Contract Documents relating to Subcontractor's Work is not described in this Subcontract and/or every item necessary to perform Subcontractor's work may not be mentioned in the Contract Documents, Subcontractor shall still perform all work necessary to finish its scope of work, including all work normally construed to come within the scope of its activities as required of Contractor in the Contract Documents.

d. Subcontractor expressly acknowledges receipt of the enclosed "Certified Payroll Form" and "Subcontractor's Pay Estimate Form." Such must be submitted weekly to Contractor for each week Subcontractor provides work or services. If Subcontractor fails to use the Certified Payroll Form or Subcontractor's Pay Estimate Form, contractor is not obligated to make any payment under this subcontract.

e. Subcontractor agrees to provide a complete and Owner approved written description (i.e. submittals) of the process it will follow (as required below) to perform the work and comply with the specification sections referenced above, if requested by Owner and in conformance with the format required by the Owner. Failure to provide such within (10) calendar days of the contract date above shall constitute a breach of contract, and in its discretion, Contractor may void this agreement.

f. Subcontractor expressly acknowledges receipt of the enclosed "Form 1413 Statement & Acknowledgment." Subcontractor agrees to sign and return such to Contractor within ten (10) calendar days of the contract date listed above. Failure to provide such shall constitute a breach of contract, and in its discretion, Contractor may void this agreement.

g.    Subcontractor expressly acknowledges receipt of the enclosed "Wage Affidavit Form." Subcontractor agrees that it will arrange for all its employees who will perform work on the project contemplated by this subcontract to sign and return this form within ten (10) calendar days of the contract date listed above. Failure to provide such shall constitute a breach of contract, and in its discretion, Contractor may void this agreement.

h.    Subcontractor expressly acknowledges receipt of the enclosed "sample insurance certificate." Subcontractor expressly acknowledges that this sample MUST BE FOLLOWED EXACTLY and must be provided by Subcontractor to the Contractor within ten (10) calendar days of the contract date listed above. Failure to provide such shall constitute a breach of contract, and in its discretion, Contractor may void this agreement. An insurance certificate must be provided before Subcontractor is permitted access to the job site.

i.    Subcontractor expressly acknowledges receipt of the enclosed Contract Labor Standards Requirements.

j.    Subcontractor agrees to submit to Contractor its proposed production and installation times for its work contained in this subcontract within ten (10) calendar days of the contract date listed above. Failure to provide such shall constitute a breach of contract, and in its discretion, Contractor may void this agreement.

k.    Subcontractor expressly acknowledges receipt of the enclosed Progress Schedule. On occasion, Contractor may revise such Progress Schedule to reflect and/or accommodate delays caused by the Property Conditions, Owner of the Premises, Contractor, Subcontractor, or other parties. Such revision shall not constitute an extension of time for completion of the project by Subcontractor. All extensions of time must be made in writing by the Contractor in its sole discretion.

5.    PERFORMANCE. All Work performed by the Subcontractor shall be in strict accordance with the Contract Documents applicable to its portion of the Work, and each document referred to above, as well as all applicable federal/state/local codes, laws, ordinances, jurisdictional requirements and prevailing wage rates.

If, in the sole judgment of Contractor the Subcontractor fails to comply, or becomes unable to comply, or with reasonable probability (as determined solely by Contractor) will become unable to comply, with any of the provisions of this Subcontract; or in the event Subcontractor fails at any time to supply a sufficient number of properly skilled workmen or sufficient supplies, materials, machines, equipment or plant of proper quality, or fails in any respect to prosecute the work with promptness and diligence; or causes by any action or omission a stoppage of delay in, or interference with the work of the Contractor or other Subcontractors of Contractor, or in the event Subcontractor abandons his work, or any part thereof; and such failure, inability, or deficiency (as determined solely by Contractor), is not corrected within three (3) calendar days after written demand by the Contractor to the Subcontractor; the Contractor may, in addition to and without prejudice to any other right or remedy, take over and complete the performance of this Subcontract, at the expense of the Subcontractor; or the Contractor may, without taking over the work, immediately and without notice to Subcontractor, furnish the necessary materials and labor, through itself or others, to remedy the situation, all at the expense of the Subcontractor. Any Subcontractor that breaches this provision, in the sole discretion of the Contractor, on more than one (1) occasion may be subject to Contractor's election to complete the work by other means or supply materials without written notice.

The parties hereto further agree that any of the following shall, at the option of the Contractor, constitute inability to comply with the provisions of this Subcontract for purposes of this Paragraph: (a) The filing of a petition in bankruptcy or a petition for the appointment of a receiver by or against the Subcontractor; or (b) The insolvency of the Subcontractor or his inability to meet his debts as they mature; or (c) The establishment of a receivership or any commitee of creditors involving Subcontractor's business or assets, or the making of an assignment for the benefit of Subcontractor's creditors; or (d) The failure or refusal of Subcontractor to respond, by written reply, to or by satisfactory compliance with, any written order or notice duly issued by the Contractor.

The Contractor is entitled to act under the terms of this Paragraph as if Subcontractor is unable to comply with this Subcontract if such inability, either for the stated reasons or others, is reasonably to be inferred from the acts or omissions of the Subcontractor, or other facts and/or circumstances; and Subcontractor hereby waives any and all defenses, claims or causes of action against Contractor based in whole or in part on the contention that Subcontractor was not unable to comply and would have been able to comply with this Subcontract were it not for the action of the Contractor pursuant to this Paragraph. It is further agreed that the Contractor shall have access to and may take possession of the Subcontractor's materials, supplies, machines, tools, equipment, and plant which may be located at the site of the work or en route to the site, as may be necessary to prosecute the work hereunder to completion, all without liability on the part of the Contractor for any damage, wear or tear, depreciation, theft, action of the elements, acts of God, fire, flood, vandalism or for any other injury or damage to such materials, tools and equipment. Upon any action by the Contractor pursuant to this Paragraph, the Subcontractor shall not be entitled to further payment on this Subcontract until the work has been completed and accepted by the Owner and payment therefor has been received by the Contractor from the

Owner. In the event that the unpaid balance due exceeds the expense incurred by the Contractor, the difference shall be paid to the Subcontractor; but if such expense exceeds the balance due, the Subcontractor agrees to promptly pay the difference to the Contractor, as hereinafter provided, and the Contractor shall have a lien upon all materials, tools, equipment and appliances taken possession of, as aforesaid, to secure the payment thereof. With respect to expenses incurred by the Contractor pursuant to this Paragraph, it is hereby agreed that the costs and expenses charges the Subcontractor as hereinbefore provided shall include, without restriction thereto, the cost of materials, labor, subcontracts, purchase orders, transportation, equipment and expense thereon, supplies, services, insurance, taxes, appliances, tools, utilities, power used or consumed, supervision, administration, job overhead, office overhead, travel, attorney's fees, legal and accounting fees and expenses.

Contractor's general overhead as allocated to the work and other costs and expenses incurred or sustained by the Contractor, plus 10% of the actual costs of the work performed as set forth in statements duly rendered, as well as the amount of claims against the Subcontractor paid by Contractor or for which it deems itself liable, less any amounts still owing hereunder, and Subcontractor agrees to pay the Contractor the full amount of such excess, if any, together with interest thereon at the rate of the highest prime rate of interest reported by the Wall Street Journal on the date the payment is due, plus 4%, until paid and in case of any default on the part of the Subcontractor, the Contractor may exercise any other right or remedy available to it. If the Wall Street Journal is not published, or does not publish the prime rate, the Contractor may designate a substitute source of the prime rate. In no instance will any action whatsoever taken by the Contractor pursuant to this Subcontract relieve or mitigate Subcontractor's full and absolute responsibility for any and all of Subcontractor's obligations with respect to the character and time of performance, discharge of claims, guarantees, warranties and all other obligations under this Subcontract.

6.    PROGRESS PAYMENTS. Provided Subcontractor's rate of progress and general performance are satisfactory to the Contractor, and provided that the Subcontractor is in full compliance with each and every provision of the Subcontract Documents, the Contractor will make partial payments to the Subcontractor upon submission to Contractor of the Subcontractor's Pay Estimate form as follows:  ninety percent (90%) of all labor, materials, equipment and/or services shall be paid as completed and/or placed in position by said Subcontractor. Such sum shall be paid in or about the first week of the following second month after placement, except the final payment (ten (10%) percent) shall be paid to the said Subcontractor within 30 calendar days after the Subcontractor has completed all of his work to the full satisfaction of the Contractor and Owner, and final payment is released by the owner, and subject to the limitations states below. All such progress payments are subject to provisions below permitting Contractor to retain monies and the requisition provisions below. All such progress payments shall be paid by Contractor to Subcontractor only if Contractor has received payment from Owner for the same period in which Subcontractor provided services or performed work. Contractor's RECEIPT OF PAYMENT FROM OWNER IS A CONDITION PRECEDENT TO ITS OBLIGATION TO PAY Subcontractor's MONTHLY REQUISITION.

Within ten (10) calendar days of the contract date listed above, the Subcontractor shall submit to the Contractor a complete and accurate schedule of values of the various parts of the work, aggregating the total sum of this Subcontract, itemized and detailed as required by the Contractor and supported by such evidence as to its correctness as the Contractor may direct. This schedule, when approved by the Contractor, shall be used as the basis for making payments, unless it be found to be in error or in conflict with the procedures or determinations of the Owner or his representative regarding partial payments to the Contractor. Should Subcontractor fail to provide such a schedule within the time allotted above, the determination shall be made in the sole discretion of the Contractor.

If the terms of this Subcontract provide for the payment of work performed on a unit price basis, the unit of measurement for payment shall be one for which certified verification of weights or quantities can be furnished at the time of delivery or readily agreed upon. In the event the parties fail to agree on the actual quantities performed, Contractor shall have the right to measure the quantity of work in place and make final settlement on the basis of such measurement.

Subcontractor shall present invoices conforming to the schedule of values or unit prices and representing a true and accurate estimate of the work completed during the immediately preceding month on the Subcontractor's Pay Estimate Form (which is enclosed herein) no later than the twenty-fifth (25th) day of each month covering all work performed and/or installed by Subcontractor up to but not including the twenty-fifth (25th) day of the preceding month. Such application shall include an accurate inventory of materials suitably stored at the job site and certified by a representative of the Owner and/or the Contractor. Partial payments will be made only upon application submitted on a form furnished or approved by the Contractor and properly certified by an officer or representative of the Subcontractor in a manner acceptable to the Contractor. Each application shall be accompanied by such additional data, invoices, vouchers, waivers, certifications and affidavits as may be required by the Owner and/or as the Contractor may, in his sole determination, require for proper processing of payments and adequate protection of the premises from potential claims of third parties. It shall be the Subcontractor's sole responsibility to submit each application for payment hereunder

in the time and in the manner prescribed herein and on the form provided or approved by Contractor for such purpose, and in no instance shall Contractor be liable for the time or sufficiency of payment pursuant to any application or request not complying herewith. The Subcontractor agrees that applications for payment not complying herewith may, at the option of the Contractor, be held over for processing at the beginning of the month or other designated period next following correction, resubmission or late submission of such application, with or without notice of Subcontractor.

Each month, Subcontractor must submit a partial release of liens with its invoices on a form provided by Contractor certifying that it has used its prior payments to pay all suppliers, Subcontractors and tax obligations for the Project. Contractor shall pay Subcontractor within ten (10) calendar days of receipt of payment from Owner subject to the conditions described above. Contractor's RECEIPT OF PAYMENT BY OWNER FOR THE SAME WORK PERIOD IS A CONDITION PRECEDENT TO ITS OBLIGATION TO PAY Subcontractor's MONTHLY REQUISITION.

Final payment will be made within thirty (30) calendar days after the work called for hereunder has been completed by the Subcontractor to the satisfaction of the Owner and the Contractor, and the Contractor has received from the Owner written acceptance thereof together with payment in full for this portion of the work. Final payment is further subject to Contractor's determination that all of the terms, conditions, requirements and covenants of the Subcontract Documents have been truly and fully met and discharged by Subcontractor. Contractor's RECEIPT OF FINAL PAYMENT FROM OWNER FOR THE SAME WORK PERIOD IS A CONDITION PRECEDENT TO ITS OBLIGATION TO ISSUE FINAL PAYMENT TO Subcontractor.

The Subcontractor, when required by the Contractor as a condition precedent to the making of final payment hereunder or at any other time, shall furnish to the Contractor a full and complete release and discharge, in a form satisfactory to the contractor, of all liens, claims, and demands arising out of or relating to the Subcontract Work and any and all materials furnished, work done and equipment used in connection therewith. Furthermore, if prior to any partial or final payment, the Owner or any party providing financing for the Project request a release of liens from the Subcontractor, the Subcontractor shall execute and deliver such release of lien in a form satisfactory to the Owner or such other party.

No partial payment, or certificate therefor, shall constitute acceptance or approval by the Contractor of the work or material for which the partial payment is made. No partial payment shall constitute a waiver by the Contractor of any right to require fulfillment of all the terms of this Subcontract. Neither the final payment nor any partial payment, nor any certificate for either, shall constitute acceptance by the Contractor of defective work or improper materials or of any element of Subcontractor's performance determined to be at variance with the Subcontract documents. Each partial payment and the final payment made hereunder, and the total thereof, will be subject to final audit and adjustment, and the Subcontractor hereby agrees to reimburse the Contractor in the event of overpayment, together with any costs and expenses, including attorney fees, the Contractor may incur in securing recovery thereof.

Notwithstanding the amounts and times of payments set forth above, the Contractor at any time may make advance payments to the Subcontractor if, in the Contractor's sole discretion, such advances will aid the Subcontractor in the performance of this Subcontract.

Contractor reserves the right to make any payment to Subcontractor, including payments due hereunder, through the medium of a check made payable to the joint order of Subcontractor and such of Subcontractor's workmen, material-men, suppliers or Subcontractors, or any of Subcontractor's creditors having potential lien rights against the work or any of them, whose claims against the Subcontractor shall, in Contractor's sole determination, be in jeopardy of non-payment. Should Subcontractor and its suppliers and material men request Contractor to issue joint checks, Contractor shall only be responsible to adhere to this Agreement if suppliers and material men present invoices to Contractor each month. In any event, Subcontractor agrees to assume full responsibility for the payments mistakenly addressed to Subcontractor, and its officers, shareholders and/or partners will individually hold Contractor harmless for all damages incurred by material-men and suppliers.

The Contractor may deduct from amounts due or to become due to the Subcontractor pursuant to this Subcontract, any sums due or to become due to the Contractor from the Subcontractor whether or not said sums are in any way related to this Subcontract or project. Contractor may apply such deducted funds to any account, related or unrelated to the Subcontract or project, wherein the obligations of the Subcontractor have not been discharged as determined by the Contractor and wherein the Contractor's interests are directly or indirectly involved.

In the event Subcontractor is in default of, or breaches or fails to comply with any provision, covenant or requirement of this Subcontract or the Subcontract Documents; or in the event that any person asserts, or indicates that he will assert, any lien, claim, demand, or charge against the project or land or improvements or funds related to the project, or against the Owner, the Contractor or any surety, arising from Subcontractor's performance of this Subcontract, the Contractor may, at his option, withhold out of any payments due or to become due to the Subcontractor such amounts as the Contractor, in its sole discretion, may deem sufficient to

completely protect and indemnify the Contractor and the Owner from any and all loss, damage and/or expense therefrom including attorney's fees and litigation costs, until the condition requiring such measures has been remedied by the Subcontractor to the satisfaction of the Contractor. If the offending condition is not remedied by the Subcontractor within a reasonable period of time, the Contractor may, at his option, proceed to make application of the withheld funds in whatever manner the Contractor may, in his sole discretion, determine as being in the best interest of himself and/or the Owner. If the Contractor is compelled to expend monies in defending, discharging or otherwise disposing of any claim or lien or other demand in excess of retained or withheld sums, the Subcontractor shall, upon demand, reimburse the Contractor for the excess amount so expended, including reasonable attorney fees and costs incurred by Contractor incident to such defense, discharge or disposition, and/or incident to Contractor's collection from Subcontractor of such excess.

Notwithstanding anything to the contrary contained in or applicable to this Subcontract, and without any limitation as to time Contractor shall not be obligated to make payments to Subcontractor under this Subcontract (a) When such payments will leave a balance due Subcontractor which is less than the retained percentage plus an amount adequate to satisfy all obligations of the Subcontractor for labor, materials, supplies, tools, machines, plant, equipment, services, etc. furnished or to be furnished by Subcontractor in performance of the work required under this Subcontract; (b) When Subcontractor is or with reasonable probability (as determined by the Contractor) may become unable to comply with or completely perform this Subcontract; (c) Whenever the Contractor, in his sole discretion, shall determine that the project is being delayed or is in danger of being delayed by the work of the Subcontractor or by any failure of the Subcontractor to effect timely compliance with any of the technical, administrative or operational requirements of the Subcontract Documents, including subsequent instructions, and schedules; (d) Pending satisfactory corrections, repair, replacement and/or restoration of faulty or deficient work, materials, supplies, machines, equipment or plant, or of any work rejected as not conforming with this Subcontract or the Subcontract Documents.

The Subcontractor hereby expressly waives any rights, claims, demands, damages or causes of action against the Contractor by reason of any payments made or monies advanced, withheld or deducted pursuant hereto and further agrees that none of the Contractor's rights or remedies otherwise provided for, including Contractor's rights as to the Subcontractor's sureties, assigns and/or creditors, shall be altered, waived, voided or rescinded thereby; nor by virtue of Contractor's failure to provide notification thereof to the Subcontractor's sureties, assigns and/or creditors or to obtain consent therefore.

The Subcontractor agrees that money received for the performance of this Subcontract shall be used solely for the benefit of persons and firms supplying labor, materials, supplies, tools, machines, equipment, plant or services exclusively for this project in connection with this Subcontract and having the right to assert liens or other claims against the land, improvements or funds involved in this Project or against any bond or other security posted by Contractor or Owner; that any money paid to the Subcontractor pursuant to this Subcontract shall immediately become and constitute a trust fund for the benefit of said persons and firms, and shall not in any instance be diverted by Subcontractor to any other purpose until all obligations arising hereunder have been fully discharged and all claims arising hereunder have been fully paid. The Subcontractor agrees, as a condition precedent to payment hereunder, to furnish the Contractor with such partial and/or final releases and/or waivers of lien as the Contractor may from time to time request.

If at any time the Contractor in his sole discretion shall determine that the Subcontractor's financial condition has become impaired, unstable or unsatisfactory, the Subcontractor shall furnish additional security satisfactory to the Contractor within three calendar days after written demand thereof is mailed or delivered to Subcontractor and in default of furnishing said additional security the Contractor shall have the option to cancel this Subcontract or to initiate such other action as the Contractor may in his sole discretion, deem necessary for the protection or preservation of his interest and/or the prevention of delay in the efficient and orderly progress of work on the Project, including but not limited to that portion of the work to be performed by Subcontractor hereunder. In the event of such cancellation, the rights of the Contractor shall be the same as if the Subcontractor had willfully refused to further perform this Subcontract.

The Subcontractor and Contractor agree as follows with respect to the assignment of such payments as may be due or as may become due under this Subcontract: (a) The Subcontractor will make no assignment of the proceeds hereof without the prior written consent of the Contractor, which consent shall not be unreasonably withheld; (b) in no instance shall the Contractor be obligated to any assignee of the Subcontractor on account of payments at any time made in good faith under any assignment and/or erroneously or inadvertently made to the assignor; (c) The Contractor shall in no instance be liable to any assignee of the Subcontractor for any amount in excess of the net sums owing Subcontractor hereunder after first deducting any amounts for which Subcontractor may otherwise be obligated or indebted to Contractor; (d) By making an assignment of the proceeds hereof the Subcontractor waives any claim against Contractor resulting from Contractor's continued payment to the assignees or former assignees, notwithstanding notification to Contractor of termination of any such assignment; (e) By making an assignment of the proceeds hereof the Subcontractor agrees to assume full liability for the conveyance of assignees of any payments mistakenly, inadvertently, or otherwise made or addressed to Subcontractor, and Subcontractor agrees to defend and hold harmless the Contractor from claim or action of any assignee related to this Subcontract.

7.    RESPONSIBILITIES OF SUBCONTRACTOR.  It is agreed that the work provided for in this Subcontract constitutes only a part of the work being performed on this project for the Owner by the Contractor and other Subcontractors. The Subcontractor therefore agrees to perform the work called for in this Agreement in such a manner that he will not injure or damage any other work performed by the Contractor or any other Subcontractor.  Subcontractor further agrees as follows:

(a)    To furnish continuous and effective protection at all times for his own work in place and all materials stored for use under this Subcontract, and to bear and be solely liable for all loss and/or damage of any kind to or in connection with said work and materials at any time prior to the final completion and acceptance thereof, unless said loss or damage is caused solely by the negligence of the Contractor and is subject to recovery under such applicable insurance policies as may be in effect;

(b)    To furnish continuous and effective measures as may be required to adequately protect the work in place and the property of the Owner, the Contractor and other Subcontractors from damage or injury as a result of his execution of this Subcontract or arising from his operations hereunder;

(c)    To report promptly to Contractor, in writing, any damage to his property or work in place, describing said damage and circumstances fully, and including, wherever available, an estimate of the cost of restoration and identification of the responsible party or parties;

(d)    Subcontractor must pay or reimburse the Contractor on account of any damage or injury to the work or property of the Owner, the Contractor and other Subcontractors caused by its own performance or that of its material suppliers, or any other parties related to the Subcontractor resulting from the execution of its work.  It shall be Subcontractor's responsibility to suitably protect, at all times, any and all fixtures, materials and equipment which possibly could be subject to damage from performance under this subcontract.

(e)    That unresolved claims resulting from glass breakage, damage to finished surfaces, permanent fixtures or equipment, and such other related occurrences wherein the identity of the responsible party is unknown or undetermined, and for which no insurance settlement may be had, the Contractor may, upon completion of the project and at the Contractor's option, be fairly and equitably pro-rated for assessment to the Contractor's account and/or to the accounts of those Subcontractors who, in the sole determination of the Contractor, were engaged on the work in a manner and at a time or times from which contributory involvement may reasonably be inferred; and the Subcontractor further agrees that Contractor's decisions or determination in such pro-ration shall be final and conclusive.

8.    DOCUMENTATION.  The Subcontractor agrees that the cost of all designs, drawings, tests, samples, templates and mock-ups required hereunder, together with field measuring, sampling and shipping or delivery expense connected with any of the foregoing, is included in the amount of this Subcontract, except the Contractor agrees to furnish field dimensions upon request when same may be obtained in less than two hours time by supervisory personnel normally present on the project at the time of the request. The Subcontractor agrees that the entire cost of altering, reworking and refinishing any manufactured or fabricated items not conforming to approved designs, drawings, templates or samples shall be borne by the Subcontractor.

9.    COSTS OF SUBCONTRACTOR.  It is hereby agreed by Subcontractor, if furnishing labor only for the finishing, installation or erection of materials furnished by Contractor, that the following costs, without restriction thereto, are to be fully recovered by Contractor from Subcontractor: (a) The full cost of materials required to replace those spoiled by Subcontractor through faulty workmanship or negligence, or damaged by any other cause not the fault of Contractor, (b) The full cost of materials wasted by Subcontractor; (c) The full cost or removing rejected materials when not properly and promptly removed by Subcontractor, together with the cost of removing, patching or replacing the work of others necessitated by such rejection; (d) The full cost of reworking, refinishing or altering any work of Subcontractor not accepted by the Owner's Authorized Agent; (e) Costs resulting from damage to materials or work of Contractor or others, and any other damages provided for in this Subcontract.

10.    COORDINATION OF CRAFTS.  This Subcontractor shall obtain Contractor's approval for any cutting, patching and blocking necessary to complete this work hereunder, and such work shall be performed to the same standards and shall match any other work performed pursuant to the Contract Documents. Further the Subcontractor shall engage the craft or crafts having jurisdiction over any work which must be cut and patched if the Contractor deems the same necessary in order to obtain acceptable results or maintain harmonious labor relations on the project. The Subcontractor further agrees to cooperate with the Contractor and other Subcontractors whose work might interfere with the Subcontractor's work and to

prepare sketches and drawings as directed, and/or participate in the preparation of coordinated drawings in areas of congestion, specifically noting and advising the Contractor of any such interference.

In order to avoid labor disputes, Subcontractor shall only employ such labor or classes of labor that will work in cooperation and harmony with the labor employed by Contractor and by other contract and other Subcontractors working on this Project. In the event of a strike or other disruption Contractor to eliminate or minimize consequences of the breach shall be borne by Subcontractor, including all counsel fees and administrative costs incurred.

11.    TIME IS OF THE ESSENCE.  Time is of the essence and the Subcontractor agrees to keep thoroughly informed as to the overall progress of the project; to commence and to prosecute the work undertaken hereunder in a prompt and diligent manner whenever such work, or any part of it, becomes available, or at such time or times as the Contractor may direct, so as to promote the general progress of the entire construction project; and Subcontractor shall not by delay or otherwise, interfere with or hinder the work or progress of the Contractor or any other Subcontractor. Any materials, services, supplies, tools, machines, equipment or plant to be furnished or used by Subcontractor hereunder shall be furnished in sufficient time to enable the Subcontractor and/or any other party requiring same, to perform and complete his or their work within the time or times established as herein provided.

Subcontractor must submit to Contractor its proposed production and installation times for its work contained in this subcontract within ten (10) calendar days of the contract date listed above.  Based on this information, the Contractor shall prepare a schedule for performance of the Subcontract Work.  The Subcontractor shall be bound by this Progress Schedule which may from time to time be revised and updated in the discretion of the Contractor and subject to the limitations described above.

Except as otherwise provided in this Subcontract, the Subcontractor agrees to notify the Contractor of his objection to, or inability to comply with, any directive, notification, order, schedule or revision thereof dealing with the time or times of his performance hereof, and to do so within three calendar days of Contractor's issuance thereof. In absence of such notice within three calendar days the Subcontractor agrees to accept for incorporation herein any and all orders, notices, directives, schedules or revisions thereof which may herewith and/or hereafter be issued from time to time by the Contractor to Subcontractor, and in the event of any conflict between the requirements of any of the foregoing, it is agreed that the time or times of performance shall be governed by the communication bearing the most recent date. Specific requirements as to time of performance in the Contract Documents, in this Subcontract, in the Subcontract Documents or subsequent additions thereto, or in directives, orders, schedules or schedule revisions issued by Contractor shall take precedence over the more general requirements of this Paragraph.

In the event of any failure of Subcontractor to complete its work within the required time or upon the dates established as provided herein above, the Subcontractor hereby agrees to reimburse the Contractor for any and all liquidated damages, if any, that may be assessed against and collected from the Contractor by the Owner, which are directly or indirectly attributable to or caused by the Subcontractor's failure to comply fully with the foregoing provisions; and further, whether or not liquidated damages are so assessed, Subcontractor hereby agrees to pay to the Contractor such other or additional damages as the Contractor may sustain by reason of any such delay directly or indirectly attributable to or caused by the Subcontractor, including, but not limited to, recovery of Contractor's overhead and expense related to managing and supervising the prime contract work during or equal to any period of time resulting from such delay of Subcontractor and office overhead; and Subcontractor further agrees that neither the payment of such damages nor any liability incurred for the payment of such damages shall release the Subcontractor from his obligation to otherwise fully perform this Subcontract.

In the event Subcontractor's performance of this Subcontract is delayed or interfered with by acts of the Owner Contractor or other Subcontractors, he may submit to the Contractor a written request for an extension of time for the performance of same.

No allowance for an extension of time, for any cause whatever, shall be claimed by the Subcontractor or be made to him, unless the Subcontractor shall have made written request upon the Contractor for such extension within three calendar days after the cause for such extension first occurred, and unless the Contractor and Subcontractor have agreed in writing upon the allowance of additional time to be made. No extension of time granted Contractor by Owner shall inure to the benefit of Subcontractor unless such extension of time is directly related to Subcontractor's work hereunder and Contractor specifically agrees in writing to an extension of time to Subcontractor therefor.

In no event shall an extension of time or allowance for extra time be granted to Subcontractor for delays attributable in any way to untimely or incorrect preparations and/or submission of drawings samples, product data, or any other submittal information required by the Contract Documents; or when priorities or procedures available to the Subcontractor have not been pursued diligently and correctly or when orders have not been placed with manufacturers or suppliers in a timely manner; or for delays resulting from

Subcontractor's substitution, or attempt to make substitution, of materials, equipment or methods of construction or manufacture in lieu of those specified or previously approved; or for any delay resulting from or attributable to Subcontractor's failure to comply with any of the provisions of this Subcontract; or when Subcontractor, by the exercise of reasonable diligence and judgment could have anticipated and avoided the delay.

12.    OBLIGATIONS.  The Subcontractor shall provide at his own expense whatever tools, machines, equipment, plant, utilities, service, storage sheds, workshops, offices, other temporary structures, and any other facilities he may deem necessary for the complete performance of all work required under this Subcontract, and shall remove any such installations and thoroughly clean and restore the site and premises during and at the completion of the work.  If the Subcontractor has occasion to utilize any of the facilities of the Contractor, when and if available, Subcontractor shall pay an equitable portion of the cost thereof; provided, however, that Contractor shall bear no responsibility for any loss or damage from any cause whatsoever arising from Subcontractor's use of such facilities.

The Subcontractor agrees to accept full responsibility for expediting and securing timely delivery of his materials, supplies, tools, machines, equipment and plant to the site of the work.

Subcontractor acknowledges that any recapitulation above of the work to be performed shall be for the exclusive purpose of clarifying the status of those items which are specifically mentioned as being included in, or excluded from, the scope of this Subcontract. Where a division of the Contract specifications is referred to in describing the work to be performed under this Subcontract, the Subcontractor shall, unless otherwise specified, perform all of the work required by such division, plus all additional related work of a similar nature generally performed by the trades or crafts employed or engaged by the Subcontractor in executing the principal work under this Subcontract, whether or not such additional work of a similar nature is specifically called for in the plans, in other divisions of the specifications, or in any other of the Contract Documents.

The Subcontractor shall not place on the work site any machines, equipment, or plant of which he is not sole owner without prior written notification to the Contractor setting forth the full name and address of the owner thereof.

The Subcontractor shall not employ any persons in the performance of this Subcontract whose employment might be reasonably objected to by the Contractor or Owner. In the interest of harmonious relations and to facilitate the orderly and efficient progress of the work on this project, the Subcontractor hereby agrees to promptly remove from the project any supervisor, employee, workman or further Subcontractor to whom the Contractor reasonably objects or to whom the Owner or the Owner's Authorized Agent objects, and such person or party shall not again be employed on any portion of the work covered by this Subcontract.

The parties hereto stipulate that for purposes of interpreting and applying this Paragraph, the term "substitution" shall be deemed to include any substitution for, modification of, or deviation from the requirements of the original plans and specifications with respect to the materials, equipment and methods of construction or manufacturing applicable to the Subcontractor's work hereunder.

The Subcontractor agrees that he has thoroughly familiarized himself with all of the various sections, divisions and sub-divisions of the Contract Documents and the Subcontract Documents, including in particular those areas in which his work hereunder may in any way affect or be affected by the work of the Contractor or other Subcontractors. The Subcontractor shall make no substitution, as defined herein, for which prior written approval of both the Owner and the Contractor has not been obtained. Such approval will not be granted by the Contractor unless applied for in writing by the Subcontractor setting forth a full disclosure of the effect of the proposed substitution upon the work of the Contractor or any other Subcontractor. In making or seeking to make any substitution, the Subcontractor hereby agrees to pay or reimburse the Contractor for any increase whatever in the cost of the work undertaken by the Contractor or by any other Subcontractor as a result of any substitution made upon initiation of the Subcontractor, approval thereof notwithstanding.  Subcontractor shall receive no extension of time to complete the work due to any delay in obtaining substitution approval.

The Subcontractor agrees, at the time of entering this Subcontract, that no substitution was contemplated in arriving at the amount of this Subcontract.

Subcontractor acknowledges that it was his responsibility, prior to entering this Subcontract, to investigate and familiarize himself with all laws, codes, prevailing wage scales, union benefits, existing labor conditions, climatological site and subsurface conditions, ordinances, regulations applicable to his work under this Subcontract and any other factors which may affect its Work; with the availability and adequacy of personnel, workmen, material, supplies, equipment, power utilities, fuel, etc. and, with respect to each of the foregoing, the cost and suitability thereof; with the prevailing wage scales, union scales, benefits and working conditions, craft jurisdictions, craft area practices, existing labor agreements including those signed by or on behalf of the Contractor; with the

character and content of all other contracts related to the project, including such separate prime contracts as may have been awarded by the Owner; the character and content of purchase orders and arrangements for supplies and material to be furnished by the Contractor for the use of Subcontractor; with all options, site considerations and restrictions, lease agreements, royalties, underground conditions, prevailing weather and climatological conditions and history; and any other factor or factors which may affect Subcontractor's work under this Subcontract. The Subcontractor hereby agrees that he has investigated all such matters and familiarized himself therewith to the extent that he, in his sole discretion, deems necessary. Subcontractor further agrees that Contractor shall not be liable to Subcontractor on any claim for additional payment or additional time or any claim whatsoever if such claim directly or indirectly results from Subcontractor's failure to investigate and familiarize itself sufficiently with the conditions under which this Subcontract is to be performed, including the foregoing but without restriction thereto, or from any misunderstanding thereof on the part of the Subcontractor.

Prior to performing any portion of the Subcontract Work, the Subcontractor shall conduct a visual inspection of the project site to become generally familiar with the local conditions and to correlate site observations with the Subcontract Documents. If the Subcontractor discovers any discrepancies between its site observations and the Subcontract Documents, such discrepancies must be promptly reported to the Contractor.

13.    WARRANTIES. Subcontractor further warrants that it has received and reviewed all plans and specifications relating to its work. Subcontractor also agrees to give proper governmental authorities requisite notice of work to be done and shall obtain at its own cost and expense all permits and licenses required. Subcontractor shall obtain and pay for all permits, licenses and official inspections made necessary by his work and shall comply with all laws, ordinances and regulations bearing on the work required under this Subcontract and the conduct thereof.

The Subcontractor guarantees the work and materials which he performs or furnishes under this Subcontract and agrees to make good, at his own expense, any defect in materials or workmanship which may occur or develop prior to Contractor's release from responsibility to the Owner therefore as required by the Contract Documents. The Subcontractor further agrees to adopt and assume, as a direct obligation to the Contractor and/or the Owner, any guarantees or warranties which would otherwise be the responsibility of the Contractor or other Subcontractors, when such guarantees or warrants have been voided, waived, withdrawn or canceled as a result of the Subcontractor's operations hereunder, or on account of any act or omission of the Subcontractor in performance of this Subcontract.

14.    SATISFACTION AND GUARANTEE OF WORK. Subcontractor's Work shall be performed to the complete satisfaction of Contractor and Owner. All Work and materials provided by Subcontractor shall be guaranteed by Subcontractor for a period of one (1) year from acceptance of the Project by Owner unless the specifications refer to another period of guarantee unless the period for such guarantee is longer under the Contract Documents. If the Owner or Contractor rejects the subcontract work, or if the subcontract work is not in conformance with the subcontract documents, the subcontractor shall promptly correct the subcontract work whether it has been fabricated, installed, or completed. Defective work and/or materials shall be replaced at the Subcontractor's sole expense, and Subcontractor shall be responsible for additional testing, inspections, and compensation for services and expenses of the Contractor made necessary by the defective subcontract work. The Subcontractor, upon two (2) calendar days written notice, shall repair and/or correct work rejected by either the Owner or Contractor for failing to conform to the requirements of the contract documents whether said work is rejected before or after final completion. If Subcontractor fails to repair and/or correct work within two (2) calendar days of the written notice, Contractor shall have the right to perform the work and charge Subcontractor for all related costs, including but not limited to attorneys fees and costs. Under this subcontract, the Subcontractor shall always bear all costs of correcting rejected work and/or materials, including costs of all other affected parties.

15.    LIENS. Subcontractor stipulates that there shall be no lien or right to lien the Project or any part thereof for the labor performed or materials furnished in the performance of its work. Furthermore, no such lien or claim shall be filed or attempted to be enforced by or on behalf of any Subcontractor or material suppliers of Subcontractor. Subcontractor agrees to advise all of its material suppliers of this provision, and shall condition any agreement with its material suppliers on acceptance of this provision. Subcontractor agrees to execute a waiver of right to file a Mechanic's Lien which may be filed on record in a format acceptable to Contractor.

The Subcontractor and any person or persons acting through or under the Subcontractor shall not file or maintain any mechanics' claims or liens against the Project, or the buildings thereof, or the lot of ground appurtenant thereto, for or on account of any work done or materials furnished by the Subcontractor and any such person or persons as aforesaid for the Subcontract Work under this Subcontract, or otherwise, for, toward, in and about the construction and erection of said Project or the buildings thereof. The Subcontractor, for and on behalf of the Subcontractor and all other person or persons as aforesaid, hereby expressly waives and

relinquishes the right to have, file or maintain any mechanics' claim or lien against the said Project, the buildings thereof and the lot of ground appurtenant thereto, or any of them, which waiver shall be and hereby is made an independent covenant and shall operate and be effective also with respect to work and labor done and materials furnished under any supplemental agreement between the Contractor and the Subcontractor, or any agreement for extra work done, performed, furnished or supplied in and about the said Project, although not therein referred to as work and labor performed and materials furnished under this Subcontract.

If at any time, there shall be evidence of a lien, stop notice or claim related to the Subcontractor or its work performed for the project, for which Owner, Contractor or its surety may become liable due to Subcontractor's failure to make timely payment, Contractor may satisfy the indebtedness and hold the Subcontractor responsible for reimbursement. Notwithstanding the foregoing, if any lien or claim is filed against Contractor, or the monies due by Owner to Contractor arising out of by reason of any breach by Subcontractor, Subcontractor shall bear all costs and expenses, including counsel fees, to defend and satisfy these claims and shall, at Contractor's request, obtain at its own expense the necessary surety bonds to discharge the lien.

16.   LIABILITY OF SUBCONTRACTOR. Subcontractor assumes entire responsibility and liability for any and all claims and/or damages of any nature whatsoever caused by Subcontractor, for which Contractor shall be liable under the Contract Documents or by operation of law with respect to the scope of the work covered by this Subcontract and agrees to indemnify and hold harmless Contractor, its surety, and/or Owner from any loss, liability, expense, including attorney's fees, damages or injuries caused directly in connection herewith.

17.   INSURANCE. Subcontractor acknowledges receipt of the attached Insurance Requirements and shall procure and maintain at its own expense the insurance required thereby. Subcontractor agrees that before commencing its Work, it shall furnish a certificate to Contractor establishing that all the insurance coverage required hereunder is in force and that it will not be canceled with less than thirty (30) calendar days prior written notice thereof by CERTIFIED MAIL to Contractor and Owner. Failure to provide such shall constitute a breach of contract, and in its discretion, Contractor may void this agreement. Such insurance shall contain no "Exclusions" or "Deductibles", except as approved in writing by Contractor. Failure of Contractor to require the production of such certificates of insurance shall not absolve Subcontractor of its obligation in respect thereto. Should Subcontractor fail to procure and maintain such insurance, Contractor shall have the right to procure and maintain same for and in the name of Subcontractor and charge the cost thereof to Subcontractor. Contractor shall be named as an additional insured.

All insurance required hereunder shall be maintained in full force and effect in a company or companies satisfactory to Contractor, at Subcontractor's expense, and until performance in full hereof has been accomplished and final payment has been issued in evidence thereof.

No payment shall be considered due and owing hereunder until certificates of insurance satisfactory to the Contractor have been received in his office.

18.   LIABILITY FOR TAXES, ETC. The Subcontractor agrees to and does hereby accept full and exclusive liability for the payment of any and all contributions, taxes or insurance of any description whatever, now or hereafter imposed by any authority, which are measured by the wages, salaries or other remunerations paid to persons employed by Subcontractor on work performed pursuant to the terms of this Subcontract. Further, Subcontractor agrees to and does hereby accept full and exclusive liability for the payment of any and all personal property taxes, inventory taxes, sales taxes, use taxes, excise taxes, fuel taxes, transportation taxes, franchise taxes, and all other taxes and/or tax assessments in any manner whatsoever relating to the materials, supplies, tools, machinery, equipment and plant which may be purchased, acquired, rented or used by Subcontractor relating to all work performed under this Subcontract as is or may be imposed or assessed by any Federal, State, Local or other political subdivision or agency. Subcontractor accepts and assumes exclusive liability for, and shall save Contractor harmless against the payment of all contributions, taxes or premiums which may be payable under the Unemployment Insurance Law of any State or under the Federal Social Security Act, measured upon the payroll of employees by whomsoever employed, engaged in the performance of the work included in this Subcontract, and all sales, use or other taxes levied or assessed against Owner, Contractor or Subcontractor, arising out of the Work, including but not limited to, taxes on any kind of materials, articles or equipment. Contractor may, at its sole discretion, request production of evidence satisfactory to it by Subcontractor that all obligations contained in the within paragraph have been paid in full as a condition precedent to Contractor making any payment whether final or otherwise hereunder.

19.   INDEMNIFICATION. The Subcontractor agrees to indemnify and save the Contractor and Owner harmless from any and all claims, suits, losses, damages or expenses on account of injuries to or the death of any and all persons whomsoever, and any and all property damages arising or growing out of or in any manner connected with the work performed by or for the

Subcontractor's account under this agreement, or caused or occasioned in whole or in part by reason of the presence of the person or property for the benefit of the Subcontractor, its employees, agents or suppliers, except when such claims or suits shall arise out of the sole negligence of the Contractor. The Subcontractor shall defend at its own expense, in the name of or on behalf of the Contractor and Owner all claims or suits for injury to persons or damage to property arising or growing out of the work carried on under this agreement except where such claims or suits arise out of the sole negligence of the Contractor. The Subcontractor shall indemnify and save the Contractor and Owner harmless from any and all claims, suits, losses, damages or expenses incurred by employees of the Subcontractor or employees of vendors or agents of the Subcontractor when such claims, suits, losses, damages or expenses shall have been incurred or alleged to have been incurred from an unsafe place to work or such similar types of complaint unless the contractor shall have been given written notice of the unsafe condition prior to any accident caused or alleged to have been caused by such unsafe place to work.

The Subcontractor shall pay all the expenses and costs of attorney's fees incurred by the Contractor and Owner in the enforcement of the conditions and obligations of this agreement, of any bond furnished in connection herewith, for the performance or non-performance of the work hereunder, and for any unsafe place to work or similar type of claim. Such expenses and costs of attorney's fees shall be recovered for the investigation, defense or the bringing of any such action by the Contractor and Owner hereunder whether such claims or allegations are valid or not.

20.  CLEAN UP AND DEBRIS.  Subcontractor agrees to keep the premises clean at all times and to remove from the site all rubbish, debris, packing materials, scrap and waste materials resulting from his work under this Subcontract. The Subcontractor is responsible to perform and complete all clean up of their debris daily and prior to the end of the working day. Subcontractor further agrees to clean and remove to the satisfaction of the Contractor, all dirt, grease, marks, stains, etc., from all finished work and property throughout the Project resulting from the execution of the work required under this Subcontract. The Subcontractor shall properly cover and protect the work of others from damage or soiling due to the performance of the work required under this Subcontract, and Subcontractor shall promptly clean, restore, or pay for the replacement of any such work damaged or soiled in the performance of his own work. If the Subcontractor refuses or fails, in the manner and time aforesaid, to promptly perform such cleaning and/or repair as directed by the Contractor, the Contractor reserves the right to clean up Subcontractor's debris, and clean, remove, or repair damage caused by Subcontractor without any notification. The Contractor shall have the right to proceed with such cleaning and/or repair, and Subcontractor, on demand therefor, shall repay to the Contractor the actual cost of such work plus a reasonable percentage to cover Contractor's supervision, insurance, tax and overhead; or at the option of the Contractor, the aforesaid charges may be accumulated and deducted from monies otherwise due the Subcontractor under this Subcontract.

21.  EQUIPMENT AND TOOLS.  Contractor will not provide Subcontractor with any equipment (including but not limited to any hoist or elevator service for lifting materials or personnel) unless otherwise specified herein.  Contractor shall also not be responsible for the safety of Subcontractor's tools and materials. Subcontractor shall not be relieved of any liability or responsibility for failure to perform hereunder by reason of Contractor's failure to provide site security (including but not limited to providing a watchman), even such security measures are required by the Contract Documents between Contractor and Owner.

22.  PRINCIPAL REPRESENTATIVE.  Subcontractor is required to have a principal representative present at weekly job and safety meetings unless excused by Contractor.  Subcontractor is required to have a principal representative present at all Certified Quality Control meetings as directed by the Certified Quality Control manager.  Subcontractor shall at all times, maintain a qualified superintendent or foreman at site who is legally authorized to represent and act for Subcontractor with respect to all matters in connection with its work.

23.  ALTERATIONS TO SCOPE OF WORK.  Subcontractor shall coordinate and compare his work with all project drawings (all of which are included herein).  If discrepancies between project drawings are discovered, Subcontractor shall be responsible to immediately notify Contractor in writing and request a clarification.  If notification is not given, Subcontractor shall be responsible for the required correction. Moreover, if Subcontractor encounters any condition upon which it may base a claim for extra compensation or time, it shall be its duty to give written notice to Contractor prior to commencing work involving these items. If no notice is given, Subcontractor shall be fully liable for any and all expense related to correction and/or repair of the condition, or any damage caused and/or resulting from this condition. No alterations shall be made in Subcontractor's Work except upon written direction by Contractor. Contractor may, at any time, by written work order and without notice to Subcontractor's surety, make changes in the Work contracted for, upon agreement of the parties hereto of the price for the adjustment. If the changes cause an increase or decrease in the cost or time for performance, an equitable adjustment shall be requested in writing by Subcontractor. Nothing hereon shall excuse Subcontractor from proceeding with the prosecution of work as changed. Subcontractor is required, however, to submit a

list of pending change orders with its monthly invoice. Failure to comply with this requirement will relieve Contractor of its obligation to adjust the contract sum or time for performance. No charges for premium time or overtime or change orders will be honored by Contractor unless signed authorization has been obtained from Contractor by Subcontractor prior to performance thereof.

24.    CHANGE ORDERS.  The Subcontractor agrees to make any claims to the Contractor for damages or additional compensation based on alleged extra work, changed conditions or any other grounds in the same manner as provided in the Contract Documents for like claims of the Contractor upon the Owner, and in such times as will enable the Contractor to present such claims to the Owner for payment or recognition; and the Contractor will not be liable to the Subcontractor on account of any claim not timely or properly presented, nor unless and until it is allowed by the Owner.

No interruption, cessation, postponement or delay in the commencement of the work or in the progress thereof from any cause whatsoever, including disputes, shall relieve the Subcontractor of its duty to perform or give rise to any right to damages or additional compensation from the Contractor except to the extent that reimbursement is received from the Owner by the Contractor therefor with respect to the work to be performed by Subcontractor hereunder, and the Subcontractor hereby expressly waives and releases any other or further right to damages or additional compensation.

If the Subcontractor encounters surfaces or work which he considers unsatisfactory and which affect the work under this Subcontract, or if the Subcontractor encounters any other condition whatsoever upon which he may base a claim for extra compensation, extra time, or any other type of claim, it shall be his duty to give written notice to the Contractor prior to commencing any work involving said conditions in order to allow the Contractor to inspect said conditions and to make such arrangements and take such steps as Contractor deems necessary. In the absence of such notice to the Contractor, Subcontractor shall be fully and solely responsible and liable for any and all expense, loss, or damage resulting from said condition and Contractor shall be relieved of all liability in connection therewith.

If a change order requires an adjustment in the subcontract amount, the adjustment shall be established by one if the following methods: (a) mutual acceptance of an itemized lump sum; (b) unit prices as indicated in the subcontract documents or as subsequently agreed upon by the parties; (c) cost determined in a manner acceptable to the parties and a mutually acceptable fixed or percentage fee; or (d) another method provided in the subcontract documents.

If the Subcontractor does not respond promptly to contractors inquiries to make a subcontract amount adjustment or otherwise fails to cooperate in forming a method of adjustment, the adjustment may be determined by the contractor on the basis of reasonable expenditures and savings of those performing the work. The Subcontractor shall maintain for the purposes of determining the adjustment the following items: (a) labor costs, including all Social Security, health, welfare, retirement, worker's compensation, and other fringe benefits expenses; (b) costs of materials, supplies, and equipment; (c) costs of renting machinery and equipment; (d) costs of bonds and insurance premiums; (e) costs of additional supervision and field overhead. Should the Subcontractor fail to maintain records of such expenses in a format reasonable accepted, Subcontractor shall have no basis to dispute contractors method of determining the adjustment.

ANY PAYMENT OF ADDITIONAL MONIES UNDER THIS PROVISION FROM CONTRACTOR TO SUBCONTRACTOR ARE CONTINGENT UPON PAYMENT FROM OWNER TO CONTRACTOR. Subcontractor hereby expressly waives any other right to damages or additional compensation should the claim be denied by the Owner, or should Owner delay approval or disapproval of Subcontractor's claim. Subcontractor shall also make no claim for delays or damage which it claims was caused by other Subcontractors on this Project.

25.    CHANGES IN THE SUBCONTRACT WORK.  When the Contractor orders in writing, the Subcontractor, without nullifying this agreement, shall make any and all changes in the Subcontract Work which are within the general scope of this Agreement. Any adjustment in the Subcontract Amount or Subcontract Time shall be authorized as per the Change Order provisions stated above. No adjustments shall be made for any changes performed by the Subcontractor that have not been approved by the Contractor.

No interruption, cessation, postponement or delay in the commencement of the work or in the progress shall be permitted due to a change to the Subcontract Work hereunder. Subcontractor shall not be permitted to refuse to perform Subcontract Work changes because of the denial of a change order as to the Subcontract Amount or Subcontract Time.

26.    TERMINATION OF SUBCONTRACT.  In the event of the termination of the Principal Contract between Owner and Contractor, this Subcontract shall also be terminated, upon written notice of Contractor to Subcontractor, and Contractor

shall only be liable for labor, materials, articles and equipment furnished, and/or materials, articles, and equipment ordered for the project up to the date of receipt by Subcontractor of such written notice of termination, but only to the extent Subcontractor is liable for same; provided, however, that Contractor shall not be liable for anticipated profits or overhead.

27.    REDUCTION OF WORK.   In the event of elimination or reduction of the work to be performed under this Subcontract by reason of termination or modification of the Contract or Contract Documents or a change in the work to be done thereunder, either in accordance with the terms of the Contract or the Contract Documents or by default by the Owner, Subcontractor shall in no case be entitled to recover from Contractor more than his fair and equitable portion of any sums received by Contractor for work done and material supplied by this Subcontractor on this Subcontract. The rights and claims of the Contractor, other Subcontractors and third parties shall be taken into consideration in determining Subcontractor's fair and equitable share.

28.    DISPUTE RESOLUTION AND ARBITRATION.   In the event of any dispute or claim between the Contractor and the Owner which directly or indirectly involves the work required to be performed by Subcontractor under this Subcontract, or in the event of any dispute or claim between Contractor and Subcontractor which directly or indirectly involves a claim against the Owner for either additional compensation and/or an extension of time under the Contract Documents, Subcontractor agrees to be bound to Contractor and Contractor agrees to be bound to Subcontractor to the same extent that Contractor is bound to the Owner by the terms of the Contract Documents and by any and all decisions, findings or determinations made thereunder by the person so authorized in the Contract Documents, or by an administrative agency or court of competent jurisdiction, whether or not Subcontractor is a party to the proceedings before said person, agency or court.

If any dispute or claim is prosecuted or defended by Contractor, and Subcontractor is not directly a party or litigant, Subcontractor agrees to cooperate fully with Contractor and to furnish all documents, statements, witnesses and other information required by Contractor for such purpose and shall pay or reimburse Contractor for all expenses and costs, including reasonable attorney's fees, incurred in connection therewith to the extent of the Subcontractor's interest in such claim or dispute. It is expressly agreed in connection with the determination of such claims or disputes, that as to any and all work done and agreed to be done by the Subcontractor, and as to any and all materials or services furnished or agreed to be furnished by the Subcontractor, and as to any and all damage, if any, incurred by Subcontractor in connection with this project, Contractor shall never be liable to Subcontractor to any greater extent than Owner is liable to Contractor.

In the event of any claim or dispute between the Contractor and the Subcontractor, other than those claims or disputes referred to in the immediately preceding paragraph, regardless of the venue of the Project, all claims or disputes arising out of this Subcontract shall be submitted to binding arbitration, upon the written demand of either party, to the American Arbitration Association in New Jersey. Once an award is rendered, the parties agree to stipulate to the entry of judgment in the Court of Common Pleas of Delaware County or the State and County in which Subcontractor is located and/or does business within 30 calendar days after expiration of the right to appeal.

In the event of any claim or dispute between Contractor and Subcontractor, as referred to in either or both of the preceding paragraphs, or otherwise, it is further specifically agreed by the parties hereto that no claim, dispute or controversy shall interfere with the progress and performance of work required to be performed under this Subcontract and that Subcontractor shall proceed as directed by Contractor in all instances with his work under this Subcontract, and that any failure of Subcontractor to comply herewith and to proceed with his work shall automatically be deemed a material breach of this Subcontract entitling Contractor to all remedies available in the event of breach and, further, shall automatically disqualify said Subcontractor from the right to arbitrate or continue in arbitration of any claim or dispute for which arbitration is commenced.

29.    CONTROLLING LAW.   Regardless of the venue of the Project, this agreement shall be construed and enforced in accordance with the laws of the State of New Jersey.  If not to be determined by arbitration for any reason, any dispute between the parties related to this contract shall be determined exclusively by the courts of the State of New Jersey. The Subcontractor hereby consents to personal jurisdiction of the State of New Jersey over it and agrees to accept service of process issuing from the courts of the State.

30.    NOTICES.   Any notice given under this Subcontract shall be in writing and sent by REGISTERED MAIL, TELEGRAM, FAX, OR HAND DELIVERED to Contractor at Wu and Associates, Inc., 597 Deer Road, Cherry Hill, NJ 08034 and to Subcontractor at the address stated in Paragraph 1 above.

When mail is used, delivery is complete on the date first occurring among the following: (a) On the day the communication is

856 857 1639    P.16

received by Subcontractor as evidenced by a return receipt furnished by the United States Post Office Department or by any recognized messenger or delivery service, (b) On the third day after the notice is deposited in the U.S. mail addressed to the Subcontractor at the project or at the address appearing on this Subcontract. Telegraphic and mail communication may be addressed to the Subcontractor at the address shown on this Subcontract or at his last known address.

31. **FORBEARANCE IS NOT A WAIVER.** It is expressly agreed that the waiver by Contractor of any breach or default of this Subcontract by Subcontractor shall not be construed as a waiver of any other breach or default of the same or any other terms, conditions, provisions or covenants of this or any other Subcontract between the parties hereto. Forbearance from demanding strict compliance with any term or provision of this Subcontract or any other Subcontract between the parties hereto shall not operate as a waiver and shall not prevent Contractor from subsequently demanding strict compliance therewith.

32. **PAYROLL REQUIREMENTS.** Subcontractor shall comply with all requirements of the Contract Documents and Subcontract Documents pertaining to payroll reports, payroll affidavits, payment of prevailing wages, benefits and contributions; anti-kickback clauses, fair labor practices, nondiscrimination clauses, equal opportunity employment laws, orders and directives, etc. insofar as such matters pertain to his work under the Subcontract. Failure of Subcontractor to observe any of the aforesaid requirements, including the prompt submission of the Contractor or required reports and affidavits, shall constitute cause for withholding progress payments until such requirements are met. It shall be the responsibility of the Subcontractor to determine his own status under the various regulatory acts relating to employment, and nothing in this Subcontract shall serve to make the Contractor liable for any errors or acts of omission or commission by Subcontractor with respect thereto. The Subcontractor agrees to consult with the Contractor in all matters pertaining to craft work assignments wherein such assignments might reasonably result in controversy or craft jurisdictional disputes.

Subcontractor hereby agrees that if any portion of his work under this Subcontract is further subcontracted, subject to provisions of this agreement, such further Subcontractor shall comply with, observe and be bound by the terms and provisions of this paragraph, and Subcontractor further agrees to incorporate the terms and provisions of this paragraph in any further subcontract.

33. BONDING. Unless specifically waived herein by Contractor, Subcontractor shall furnish, without expense to the Contractor and within ten (10) calendar days of the date hereof, a performance bond and payment bond, each for the full amount of this Subcontract as set forth above. The two bonds shall be drawn in favor of the Contractor and shall be executed by a surety company acceptable to the Contractor (in its sole discretion) and on forms furnished by the Contractor or approved by the Contractor's home office. No payment whatsoever shall be due the Subcontractor until the provisions of this Paragraph have been met to the Contractor's satisfaction.

No change, alteration or modification in the terms and conditions of this Subcontract, or in the terms or manner of payment shall in any way exonerate or release, in whole or in part, any surety on any bond furnished by or on behalf of the Subcontractor. If required to do so by the Contractor, prior to commencement of any work required hereunder, Subcontractor shall obtain, and furnish to Contractor, a copy or counterpart of this Subcontract which shall have been endorsed in writing by an authorized representative of its surety company, specifically approving this Subcontract.

4. **CONTACTS WITH OWNER.** The Subcontractor's exclusive responsibility for the performance of this Subcontract is to the Contractor and it is agreed that all of Subcontractor's dealings with the Owner's Authorized Agent, the Owner, or any other parties named in the Contract Documents shall be through the Contractor. No claim of any nature will be recognized, nor shall Contractor be liable on account thereof, unless all matters pertaining to such claim have been directed through Contractor's office. The Subcontractor further agrees that neither he, nor his representatives on the project, shall make any agreement, written or oral, with the Owner's Authorized Agent or with the Owner, or with representatives of either, pertaining to any phase of the performance of this Subcontract.

**BAR OF DISCRIMINATION.** The Subcontractor, in performing the work required by this Subcontract, shall not discriminate against any employee or applicant for employment because of sex, age, race, creed, color or national origin. The Subcontractor agrees that the preceding paragraph will be inserted verbatim in all of its further subcontracts which shall be made pursuant to the provisions herein.

**USE OF SUBCONTRACTORS.** When requested to do so by the Contractor, Subcontractor agrees to submit a list of any proposed sub-Subcontractors, and Subcontractor shall not delegate, sublet, or further subcontract to others in performance of any of his obligations or work required or contemplated by this subcontract without prior written consent of the Contractor which shall not be unreasonably withheld. For the purpose of interpreting this Paragraph, a "subcontract" is defined as any

contract entered into by the Subcontractor with any individual, partnership, association, corporation, estate or trust, or other business enterprise or other legal entity, for a specific part of the work to be performed or materials to be produced or services to be rendered at the site of the project which is the subject of this Subcontract.

37.    EFFECTIVE DATE.    The effective date of this Subcontract is intended by both parties to be the date indicated at the beginning of this Subcontract. The dates appearing by the signatures at the end of this document merely indicate the dates that the signatures were affixed. Contractor and Subcontractor agree that the date above shall be used to calculate all deadlines stated below.

38.    OCCUPATION.    Whenever it may be useful or necessary to the Contractor to do so, the Contractor shall be permitted to occupy and/or use any portion of the work which has been either partially or fully completed by the Subcontractor before final inspection and acceptance thereof by the Owner, but such use and/or occupation shall not relieve the Subcontractor of his guarantee of said work and materials nor of his obligation to make good at his own expense any defect in materials and workmanship which may occur or develop prior to Contractor's release from responsibility to the Owner, provided, however, the Subcontractor shall not be responsible for the maintenance of such portion of work as may be used and/or occupied by the Contractor, nor for any damage thereto that is due to or caused by the sole negligence of the Contractor during such period of use.

39.    SOLE AGREEMENT.    This Subcontract constitutes the entire agreement between the parties and contains all of the covenants, stipulations, and provisions agreed upon by the parties. This Subcontract supersedes and takes precedence over all proposals, correspondence, and oral agreements between the Subcontractor, and Contractor if any, made prior to and including the date hereof, and not specifically identified and incorporated in writing in this Subcontract.

This Subcontract includes all alternates, changes, addenda, amendments, corrigenda, or any other instruments of like effect made, issued, or exercised by the Owner or the Owner's Authorized Agent through the date hereof. No agent or representative of either party hereto has authority to make, and the parties shall not be bound by, or liable for, any statement, representation, promise, or agreement not specifically set forth in this Subcontract. Except as otherwise provided for herein, no changes, amendments or modifications of the terms hereof shall be valid unless reduced to writing and signed by the parties hereto. Words used in this Subcontract in the masculine gender include the feminine and neuter; the singular number includes the plural, and the plural the singular.

To the best of knowledge and belief of the parties, this Subcontract now contains no provision that is contrary to Federal or State law, or to any ruling or regulation of a State or Federal agency. Should, however, any provision of this Subcontract at any time during its effective term be in conflict with any such law, ruling or regulation, then such provision shall continue in effect only to the extent permitted. In the event any provision of this Subcontract is thus held inoperative, the remaining provisions of this Subcontract shall nevertheless remain in full force and effect to the extent permitted by law. Each and every provision of law and clause required by law to be inserted in this Subcontract shall be deemed to be inserted herein and this Subcontract shall be read and enforced as though it were included herein, and if through mistake or otherwise any such provision is not inserted, or is not correctly inserted, then upon the application of either party this Subcontract shall forthwith be physically amended to make such insertion or correction.

IN WITNESS WHEREOF, the parties hereto intending to be legally bound hereby set their hands and seals as of the dates stated below.

{ORIGINAL SIGNATURES}

WU AND ASSOCIATES, INC.                          DATE

        BY: ___Raymond Wu, P.E.___  (print name)    TITLE: ___President___

BRENDAN WARD MASONRY, INC.                       DATE

        BY: _____  (print name)    TITLE: _____

MAR 28 2002   11:04        WU ASSOCIATES                      856 857 1639      P.18

Wu & Associates, Inc.
597 Deer Road
Cherry Hill, NJ 08034
Tel: 856-857-1639
Fax: 856-857-1729
Email: info@wuassociates.com

PROJECT NO: __0102__

SUBCONTRACT NO: __0102-17__

## SCOPE OF WORK – EXHIBIT A

1. Except as specifically noted, Subcontractor shall provide and pay for:

   (A)  All labor, materials, and equipment;
   (B)  Tools, construction equipment and machinery;
   (C)  Supervision, other facilities, and services;
   (D)  Insurance; and
   (E)  ~~100% Payment Bond and 100% Performance Bond~~

2. The Subcontractor shall have full responsibility for the following specifications: Section 04200 - Unit Masonry, Section 04400 Cast Stone (setting and supply anchors only) and all sections applicable for completion of this contract.

3. This subcontract includes, but is not limited to the following, which shall be considered as part of this Subcontract:
   (i) Addendum No. 1, dated 7/25/01;
   (ii) Addendum No. 2, dated 8/6/01 w/ drawings E2.03, E2.04;
   (iii) Contract Specifications Volume 1 and 2 dated 6/28/01 by Tevebaugh Associates;
   (iv) All contract drawings sheet CS01 to sheet E4.03 dated 6/28/01;
   Subcontractor expressly acknowledges receipt of each document referred to above, and agrees to be bound to the terms thereof, as if made a party thereto.

4. In addition to the performance of the work listed in the specifications attached hereto or the specification section identified above, Subcontractor agrees to perform the following: all interior and exterior masonry work including but not limited to platform, piers, CMU wall @ transformer, wall @ vehicular entrance with stone, the garden wall, supply and install rigid foam insulation, bond beam, S&I reinforcing steel, S&I thru-wall flashing, washing down, scaffold, 4" glazed blocks @ floor level, smooth face blocks, split face blocks, daily cleaning, removal of debris to dumpster, cold weather protection, all CMU foundations must be completed by May 15, 2002.

5. Exclusions. The following items(s) is (are) excluded from this subcontract: bond, dumpsters, setting door frames, pre-cast stone material, testing, permit, brick pavers, excavation and grading.

6. Subcontractor acknowledges the receipt of the following attachments:

   a)  Affirmative Action Policy.
   b)  Insurance Requirements for Subcontractors.
   c)  Drawings, and specifications as noted above.
   d)  Prevailing Wage Affidavit Form - all employees who will work on this project must sign and return this form.
   e)  Sample insurance certificate (THIS SAMPLE MUST BE FOLLOWED EXACTLY WITH REGARD TO THE CANCELLATION CLAUSE AND DESCRIPTION OF OPERATIONS SECTIONS BEFORE YOU CAN OBTAIN ACCESS). Insurance certificate must be submitted prior to start of work.
   f)  Certified Payroll form.
   g)  Subcontractor's Pay Estimate form, Wu PM-009, must be used when submitting invoices for payment processing. THE WU PM-009 MUST BE FILLED OUT AND RETURNED WITH THIS CONTRACT BEFORE WE CAN EXECUTE SAME.

MAR-28-2002  11:05        WU ASSOCIATES                              000 007 1035    P.19

h)   Prevailing Wage Rates.
i)   W-9.
j)   Progress Schedule.
k)   We Bond Forms.

## END OF SCOPE OF WORK – EXIBIT "A"

IN WITNESS WHEREOF, the parties hereto intending to be legally bound hereby set their hands and seals as of the dates stated below.

(ORIGINAL SIGNATURES)

_____    _____
WU AND ASSOCIATES, INC.          DATE

       BY:   _Raymond Wu, P.E._____    (print name)    TITLE:   _President_____


_____    _____
BRENDAN WARD MASONRY          DATE

       BY: _____    (print name)    TITLE: _____

EXHIBIT "B"

1

**PETER NEELY MILLIGAN, ESQ.**
1960 Route 70 East
Cherry Hill, NJ 08003
(856) 983-0003
Attorney for Wu & Associates, Inc.

### TOLLING AGREEMENT

This tolling agreement is made and entered into between WU &
ASSOCIATES, INC. and BRENDAN WARD MASONRY INC. by their
respective undersigned counsel;

WHEREAS, Wu & Associates, Inc. has or will shortly submit
all claims made and their supporting documentation of Brendan
Ward Masonry, Inc. in the current pending case under Case No.
2003-BCA-1;

WHEREAS, Brendan Ward Masonry, Inc. has expressed
dissatisfaction with the arbitrator appointed by AAA;

WHEREAS, Wu & Associates, Inc. has expressed its position
that it does not believe that this matter is ripe for
arbitration, that is, until the pending Department of Labor
litigation is closed; and

WHEREAS, both parties agree that duplicative expenses in the
Department of Labor litigation and an arbitration are
unnecessary;

NOW THEREFORE, in consideration of the mutual agreements
hereinafter set forth, each party intending to be legally bound
hereby, the parties covenant and agree as follows:

1.   As used herein, the following terms shall have the following
     meanings:

     a.   "CLAIMS" shall mean any and all claims and causes of

### PETER N. MILLIGAN, ESQ.
────────ATTORNEY AT LAW────────

2

action, known or unknown, which the parties have against each other in any capacity regarding the construction project with the Department of Labor in Wilmington, DE.

b.  "EXPIRATION PERIOD" shall mean thirty (30) days after written notice to the undersigned from Sean T. O'Meara, Esq. of the final resolution, without possibility of appeal, of the matter pending under Case No. 2003-BCA-1, or 366 days (whichever comes first).

c.  "TOLLING PERIOD" shall mean the period from and including the date this agreement is executed to and including the expiration date.

d.  The tolling agreement embodied herein shall be for the mutual benefit of the parties.

2.  The parties agree to dismiss and withdraw the pending AAA arbitration pending under 14Y1100101004;

3.  The parties stipulate, covenant, and agree to the suspension during the tolling period of the running of all statutes of limitation, laches periods, or similar defenses based upon a lapse of a period of time that may otherwise be asserted by it as a full or partial defenses against any claims;

4.  The parties hereby agree to arbitrate any claims that exist after the expiration period, and agree to initiate such claims by the conclusion of the Expiration Period.

5.  Prior to the Expiration Period, the parties shall negotiate in good faith to select a mutually acceptable arbitrator.

PETER N. MILLIGAN, ESQ.
————ATTORNEY AT LAW————

3

If unable, the parties will appoint their own arbitrators, and be responsible for their own arbitrator's costs. The two (2) appointed arbitrators will then select a neutral arbitrator. The expenses of the neutral arbitrator will be equally shared by the parties.

6. Except to the extent set forth above with the respect to the time related defenses, this tolling agreement shall not affect any other defenses or claims that the parties may have.

7. This tolling agreement constitutes the full and complete agreement between the parties. This tolling agreement may not be modified except in writing.

8. This tolling agreement may be executed in any number of originals or telecopied counterparts.

9. The parties agree that this tolling agreement nor any acts or statements related to it shall constitute any admission of liability, and that this tolling agreement may not be introduced or received into evidence.

Peter Neely Milligan, Esq.
Attorney for WU & ASSOCIATES, INC.

By:_____
        Peter Neely Milligan, Esq.

Dated: December 16, 2004

Paul A. Bucco, Esq.,
Attorney for BRENDAN WARD MASONRY INC.

By_____
        Paul A. Bucco, Esq.

Dated:

PETER N. MILLIGAN, ESQ.
——————ATTORNEY AT LAW——————

EXHIBIT "C"

## APPROVED ADDITIONS TO BASE CONTRACT

| Date | Description | Amount |
|------|-------------|--------|
| 12-17-02 | Change Order No. 1, Saw cut block at footers | 615.00 |
| 01-20-03 | Change Order No. 2, Additional masonry changes for pump use | 2,406.00 |
| 01-20-03 | Change Order No. 3, Re-layout base course | 567.00 |
| 10-23-03 | Change Order, No.4, Grout addition to corridor column | 273.84 |
| 02-13-04 | Change Orders Nos. 17 and 31, Re-locate beam pockets and repair for Roof Truss | 1,742.50 |
| | **Total   $** | **3,861.84** |

EXHIBIT "D"

## UNAPPROVED BACK CHARGES TO THE TO BASE CONTRACT

| Date | Change | Amount |
|------|--------|--------|
| 01-13-03 | Back Charge for completing the garden wall and related pier masonry | 73,350.20 |
| 02-13-04 | Back Charge to demolish completed chases Because mechanical contractor was behind schedule | 1,930.14 |
| 02-16-04 | Back Charge to complete "new" punch list | 5,751.20 |
| | Total $ | 81,031.54 |

**EXHIBIT "E"**

## UNAPPROVED CHANGE ORDERS/ADDITIONS TO THE BASE CONTRACT

| Date | Description | Amount* |
|------|-------------|---------|
| 10-28-02 | Addition to Change Order #2 to correct wall due to incorrect layout | $ 1,217.00 |
| 02-05-03 | Change Order #32: Demolition of walls at corridor cracks | 994.00 |
| 02-06-03 | Change Order #33: Repair Corridor Cracks | 950.00 |
| 02-24-03 | Change Order #34: Repair to corridor cracks caused by Additional steel being welded | 796.00 |
| 02-25-03 | Additional time for layout and fabrication of new angle and plates for corridor, elevator shaft and hallway for SKS #18 | 1,114.00 |
| 03-21-03 | Change Order #7: Water obtained from local merchant for masons as none on job site | 17,075.00 |
| 04-23-03 | Change Order #12: Additional wall per Wu Request For Information #92 | 948.00 |
| 05-09-03 | Change Order #16: Clean up of over-pour by concrete subcontractor | 303.00 |
| 05-09-03 | Change Order #18: Extended floor where concrete subcontractor improperly poured concrete per Wu's instructions | 639.00 |
| 10-21-03 | Change Order #21: Patching Rooms 202 and 212 | 767.00 |
| 10-21-03 | Change Order #22: Patching Refrigerator/Freezer Area | 568.00 |
| 10-21-03 | Change Order #23: Infilling block Room 203 | 953.00 |
| 10-21-03 | Change Order #24: Patching Rooms 208 and 248 | 953.00 |
| 10-21-03 | Change Order #25: Patching Culinary Arts Room | 953.00 |
| 10-21-03 | Change Order #26: Patching Food Prep and dining areas | 953.00 |
| 10-21-03 | Change Order #27: Grouting under steel columns | 274.00 |
| 11-04-03 | Change Order #28: Replacing chase walls cut by Wu | 2,662.00 |

| 11-04-03 | Change Order #29: Replace block at roof junction | 1,692.00 |
| 11-04-03 | Change Order #30: Moving materials per Wu request | 2,264.00 |
| 11-10-03 | Change Order #20: Garden Wall Adjustments per Construction Permit Review #18 | 6,857.00 |

**Total:**     **$42,934.00**

*Rounded to nearest dollar

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

_____

| | | |
|---|---|---|
| **BRENDAN WARD MASONRY, INC.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **BREACH OF CONTRACT** |
| **v.** | : | |
| | : | |
| **WU & ASSOCIATES, INC.,** | : | **JURY TRAIL DEMANDED** |
| | : | |
| **Defendant.** | : | **CIVIL NO. 07-cv-00751 GMS** |
| _____ | : | |

## <u>PROPOSED ORDER</u>

AND NOW, this _____, day of _____, 2008, the Court having considered the

Motion of Plaintiff, BRENDAN WARD MASONRY, INC., for Leave to File its Second

Amended Complaint, and having considered any opposition thereto, and for good cause shown,

IT IS HEREBY ORDERED that this Motion is GRANTED.


_____
J.

**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **BRENDAN WARD MASONRY, INC.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| | : | **BREACH OF CONTRACT** |
| | : | |
| **v.** | : | |
| | : | |
| **WU & ASSOCIATES, INC.,** | : | **JURY TRAIL DEMANDED** |
| | : | |
| **Defendant.** | : | **CIVIL NO. 07-cv-00751** |
| | : | |

<u>**CERTIFICATE OF SERVICE**</u>

I, PERRY F. GOLDLUST, do hereby certify that the attached Motion of Plaintiff, Brendan

Ward Masonry, Inc., for Leave to File its Second Amended Complaint was E-filed and a copy

mailed by U.S. Mail, postage-prepaid, on May 21, 2008 to:

> Peter L. Frattarelli, Esquire
> Archer & Freiner, P.C.
> 300 Delaware Avenue
> Suite 1370
> Wilmington, DE  19801

ABER, GOLDLUST, BAKER & OVER

/s/ Perry F. Goldlust (DSB #770)
PERRY F. GOLDLUST (DSB #770)
702 King Street, Suite 600
P. O. Box 1675
Wilmington, DE  19899-1675
(302) 472-4900; (302) 472-4920 (FAX)
pgoldlust@gablawde.com
*Attorney for Plaintiff Brendan Ward Masonry, Inc*

DATED: <u>May 21, 2008</u>

Of Counsel:
JOHN E. HILSER, ESQUIRE
DEVLIEGER HILSER, P.C.
1518 Walnut Street, 16th Floor
Philadelphia, PA 19102
(215) 735-9181; (215) 735-9186 (FAX)
jhilser@dvhlaw.com

Client/Hilser/Certificate of Service-Motion to Amend Cmp